JEFF K. JOYNER (SBN 180485)
jjoyner@glaserweil.com
GIANNA SEGRETTI (SBN 323645)
gsegretti@glaserweil.com
ROBERTO C. ARBULU (SBN 340381)
rarbulu@glaserweil.com
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
Phone: (310)553-3000
Fax: (310) 556-2920

PETER M. BRANSTEN (SBN 113352)
pbransten@glaserweil.com
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Phone: (415) 510-4815
Fax: (415) 510-4790

*Attorneys for Plaintiff*
*DASH.FI TECHNOLOGIES INC.*

Glaser Weil

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

DASH.FI TECHNOLOGIES INC., a Delaware corporation,

Plaintiff,

v.

META PLATFORMS, INC., a Delaware corporation,

Defendant.

CASE NO.: 3:26-cv-11130

**PLAINTIFF DASH.FI TECHNOLOGIES INC.'S COMPLAINT FOR:**

**(I) UNFAIR COMPETITION, 15 U.S.C. § 1125(a)(1)(B);**
**(II) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**
**(III) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;**
**(IV) CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. C. § 17200 ET SEQ.**

**DEMAND FOR JURY TRIAL**

Plaintiff Dash.Fi Technologies Inc. ("Plaintiff" or "Dash.fi"), brings this Complaint against Defendant Meta Platforms, Inc. ("Defendant" or "Meta"), for (1) unfair competition in violation of 15 U.S.C. § 1125(a)(1)(B), (2) intentional interference with contractual relations, (3) intentional interference with prospective economic relations, and (4) unfair business practices in violation of California Business and Professions Code section 17200, *et seq.*, and alleges as follows:

**INTRODUCTION**

1. Meta operates one of the largest online advertising platforms in the world. Facebook and Instagram command such a dominant share of digital advertising that Meta's services are effectively unavoidable for any business seeking meaningful online reach. Meta exploits that dominance by systematically billing advertisers for invalid clicks and traffic that falls outside campaign parameters, including bot-generated clicks, zero-bounce traffic, out-of-geo delivery, and non-human impressions. On average, approximately 2.4% to 3.5% of advertisers' charges incurred on Meta's platforms, as audited by Dash.fi, are attributable to fraudulent clicks and invalid traffic.

2. Meta offers no genuine dispute-resolution mechanism. When advertisers raise concerns about billing errors or discrepancies, Meta directs them to submit refund requests to specific support channels where Meta declines them outright, provides no substantive response, or in most cases, fails to respond at all. Advertisers are then left to decide whether to pursue costly and time-consuming arbitration—risking having their accounts suspended or terminated entirely—or simply accept the improper charges and absorb the losses. Most advertisers on Meta's platforms are heavily reliant on online advertising and, given Meta's dominant market share of the online advertising space, therefore select the latter option to maintain their businesses.

3. Dash.fi offers advertisers a third option to identify, scrutinize, and combat Meta's fraudulent billing practices. Dash.fi is a financial technology company and the program manager of a Mastercard-branded corporate credit card (the "Dash.fi Card"), which its customers use to purchase advertising on Meta's platforms. The Dash.fi Card includes an Ad Pay Protection feature that audits advertising to identify fraudulent clicks and invalid traffic and enables customers to submit refund requests to Meta and—when those requests are refused—to escalate disputed charges

Glaser Weil

through the card network's chargeback process.

4. Dash.fi's ability to expose Meta's fraudulent practices and provide advertisers with a legitimate channel for recouping fraudulent advertising charges from Meta threatens Meta's business model built on charging advertisers for traffic it knows to be invalid. To date, Dash.fi has recovered approximately $35 million on behalf of its cardholders via chargebacks.

5. Unbeknownst to Dash.fi, that success rate made Dash.fi the target of a retaliatory campaign (the "Dash.fi Ban") orchestrated by Meta. Since early 2025, Meta has targeted Dash.fi with increasingly unfair, unlawful, and anticompetitive actions as part of its continued scheme to hide invalid traffic from advertisers and inflate its profits through fraudulent charges. Meta started the Dash.fi Ban by quietly declining charges on Dash.fi Cards; escalating to outright blocking use of the Dash.fi Card on its platforms and disseminating false and misleading statements to Dash.fi's current and prospective customers concerning Dash.fi and its services—all in an effort to drive advertisers toward Meta's own advertising credit lines where consumers have no independent recourse to challenge Meta's fraudulent billing; and ultimately banning Dash.fi and its employees from all Meta platforms and threatening suit against them.

6. Dash.fi brings this action to restore its customers' ability to use the Dash.fi Card on Meta's platforms, to repair the significant damage Meta has inflicted on Dash.fi's business and reputation, and to recover damages caused by Meta's tortious interference and unfair business practices.

## PARTIES

7. Plaintiff Dash.Fi Technologies Inc. is a corporation formed under the laws of the State of Delaware with its principal place of business in Austin, Texas.

8. Defendant Meta Platforms, Inc. is a corporation formed under the laws of the State of Delaware with its principal place of business at 1 Meta Way, Menlo Park, California 94025.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction over the First Cause of Action, which alleges a violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)), pursuant to 28 U.S.C. §

1331. This Court has supplemental jurisdiction over the remaining state-law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy.

10. The Court has personal jurisdiction over Meta because Meta's principal place of business is in this District, Meta has substantial, systematic, and continuous contacts with this District, and Meta committed acts giving rise to Dash.fi's claims in this District.

11. Venue is proper under 28 U.S.C. §§ 1391 because: (a) a substantial part of the events giving rise to the claims occurred in this District, (b) Meta resides in this District, and (c) Meta has a regular and established place of business in this District.

## BACKGROUND

### A. The Dash.Fi Card

12. Dash.fi developed and manages the Dash.fi Card, a Mastercard-branded corporate credit card issued by TransPecos Bank, a state-chartered bank ("TransPecos Bank"), and Patriot Bank, N.A. ("Patriot Bank"). The Dash.fi Card is designed specifically for digital advertisers who purchase advertising on platforms such as Meta's Facebook and Instagram. Dash.fi's customers use the Dash.fi Card to pay for advertising campaigns and, in doing so, gain access to Ad Pay Protection, a proprietary feature that enables Dash.fi's customers to scrutinize the advertising charges billed by platforms such as Meta.

13. As part of the Ad Pay Protection program, Dash.fi Card users authorize Dash.fi via the Dash.fi Cardholder Agreement and Ad Pay Protection Terms and Conditions to issue, manage, and maintain virtual payment cards associated with their Meta advertising accounts and submit refund requests and pursue recoveries on their behalf for overcharges.

14. Ad Pay Protection allows the advertiser to identify charges attributable to invalid traffic—including bot-generated clicks, zero-bounce sessions, out-of-geo delivery, and non-human impressions. If invalid traffic is identified, Dash.fi submits a refund request directly to the advertising platform on behalf of the cardholder. If the platform denies the request or fails to respond, Ad Pay Protection enables the cardholder to escalate the disputed charge through Mastercard's chargeback process.

15. Since mid-2025, Dash.fi has pursued approximately 11,800 such chargeback disputes against Meta on behalf of its cardholders, totaling approximately $39 million, of which approximately $35 million has been returned to cardholders so far.

**B. <u>Meta Engages in Systematic Fraudulent Billing Practices</u>**

16. Meta's platforms, Facebook and Instagram, command such a large share of the digital advertising market that most businesses seeking meaningful online reach have no practical alternative to advertising on Meta's platforms. Meta's dominance affords it extraordinary leverage over advertisers, who must accept Meta's billing practices, payment terms, and dispute procedures as a condition of purchasing advertising on the platform. Despite Meta's public commitments to third-party verification of the advertising data it provides to advertisers, Meta systematically bills advertisers for invalid clicks and traffic that falls outside the parameters of their advertising campaigns.

17. Dash.fi's audits—conducted using tracking data captured on its cardholders' own websites and reconciled against the clicks and charges Meta reported for the same campaigns—have consistently identified invalid traffic across Dash.fi's cardholder base. Dash.fi's internal audits of its customers' advertising campaigns on Meta's platforms between October 2025 and June 2026 found that approximately 2.4% to 3.5% of charges incurred derived from invalid traffic.

**C. <u>Meta Initiated Invisible Declines of the Dash.fi Card</u>**

18. Beginning in January 2025, Dash.fi began auditing advertising traffic on Meta for its cardholders and identifying charges attributable to fraudulent clicks and invalid traffic. With this information, Dash.fi began initiating refund requests on behalf of its cardholders to Meta for the overcharges for fraudulent clicks and invalid traffic. Meta's competitor Google actually responded to similar refund requests pursued by Dash.fi on behalf of its cardholders due to invalid charges and returned a significant portion of ad refunds sought. However, Meta either immediately rejected or flat out ignored nearly all invalid-traffic refund requests initiated by Dash.fi.

19. By spring of 2025, however, Meta began declining charges on the Dash.fi Card for certain advertisers for no stated reason and directing cardholders to contact the card issuer. These




Glaser Weil

declines were invisible to Dash.fi. When Dash.fi and advertisers contacted Meta regarding these card declines in March of 2025, a Meta representative responded that “due to policy restrictions [they were] unable to share the specific reason for the declined payment[s].”

20. In April of 2025, advertisers also reported that they were having trouble adding the Dash.fi Card to their accounts.

21. In mid-2025, Dash.fi began initiating chargeback disputes on behalf of advertisers against Meta, as expressly authorized by Dash.fi Card users via the Dash.fi Cardholder Agreement and Ad Pay Protection Terms and Conditions.

22. By July 2025, the Ad Pay Protection program focused on setting preventative IP blocking and negative-audience exclusions for its cardholders through Meta’s API. In that regard, Dash.fi was proactively setting advertising parameters for its participating users based on its auditing of ad traffic to exclude known IP addresses connected with bot accounts and traffic. However, advertisers avoided adding new negative-audience exclusions to established advertising campaigns on Meta’s platforms due to negative impacts. This is because changing campaign parameters forcing those campaigns back into compliance review and triggers the platform’s learning algorithm to start over.

23. Dash.fi also discovered that within days or weeks of a chargeback dispute being initiated on a Dash.fi Card, Meta spend on that card would stop.

24. Under Mastercard's rules, Meta had the opportunity to contest each chargeback through a second presentment. If Dash.fi then pursued pre-arbitration, Meta could carry the dispute to a decision by Mastercard. Of approximately 11,800 disputes, approximately 5,400, totaling approximately $17.5 million, closed because Meta did not respond within the time Mastercard's rules allow. Meta contested most of the remainder through second presentments. When Dash.fi pursued those disputes to pre-arbitration Meta accepted approximately 4,900 of them, totaling approximately $17.7 million. In all, approximately $35 million of the $39 million disputed was returned to Dash.fi cardholders. Approximately $4 million remains pending.

25. By July 2025, Meta began blocking bank identification numbers (“BINs”) associated



Glaser Weil

with Dash.fi Cards, disrupting Meta spend volume for Dash.fi's top-spending cardholders. Meta did so without any notice or acknowledgment of its actions. Dash.fi Card users were able to continue using other non-Dash.fi credit cards on their Meta advertising accounts. But they could not use the Dash.fi Cards saved to their accounts or add new Dash.fi Cards with the same BINs. Dash.fi was able to successfully swap out blocked cards with cards with newly-issued BINs.

26. In September 2025, Meta began switching Dash.fi Card users to backup cards saved to their Meta advertising accounts without notice to account holders and auto-declining the Dash.fi Card without sending decline notices to Dash.fi.

27. By October 2025, Meta began declining the Dash.fi Card across many high-spend accounts. On Dash.fi's end, nothing appeared wrong with the card numbers, and it could not see the declines. Mastercard assured Dash.fi Card users and Dash.fi that "the BIN [associated with the declined cards] appear[ed] very healthy with the merchant…" but that the declines appeared to be due to fraud.

28. In October 2025, Meta declined Dash.fi Card charges for some of Dash.fi's highest spending users informing one with an expected $8 million per month spend that the declines of the advertiser's Dash.fi Card were "on the processing side and not [Meta's]." This was not true as Dash.fi saw no declines on the card. Mastercard also found nothing wrong on its side. The Dash.fi Card user was reluctant to replace the Dash.fi Card on its advertising account. It feared doing so would trigger a fraud alert and shut down the account. The Dash.fi Card user instead ceased using the Dash.fi Card or engaging with Dash.fi entirely.

29. On December 18, 2025, Meta, with no notice to the advertising customer, refunded 29 charges on the Dash.fi Card for one advertiser. Meta simultaneously re-billed the charges to another non-Dash.fi credit card saved to its account. Meta directed the advertiser to "contact the payment provider" when advertiser questioned it about this. Dash.fi had no knowledge of why Meta had taken such action.

30. By February 2026, Dash.fi was formally providing its cardholders with a formal white-glove service of rotating Dash.fi Cards saved to their Meta advertising accounts. Dash.fi did

this to combat the card declines and BIN blocks initiated by Meta. However, by March 2026, Meta began declining Dash.fi Cards even faster.

31. In May 2026, one advertiser reported that Meta immediately banned its ad account after it linked a Dash.fi Card. Many Dash.fi Card users stopped using the Dash.fi Card and informed Dash.fi that they were ceasing business relations with Dash.fi due to the issues caused by Meta continually blocking the Dash.fi Card.

**D. <u>Meta Mandated Dash.fi Card Users Move to Monthly Invoicing</u>**

32. In February and March of 2026, Meta sent communications to cohorts of Dash.fi Card users mandating that they were required to switch to monthly invoicing offered through Meta payable only by ACH by a certain deadline. Meta also told these users that Meta would no longer accept credit cards on their advertising accounts. Meta warned advertisers in account notices and messages from Meta billing representatives that advertisers therefore must switch payment methods by the deadline set to avoid disruption to their advertising accounts and ongoing campaigns.

33. Several Dash.fi Card users with Dash.fi's assistance sent formal letters to Meta representatives requesting that they be permitted to continue using the Dash.fi Card or at least be given extensions of the deadlines set by Meta. Meta's outside counsel responded that Meta's decision to move advertisers to monthly invoicing was final with "no exceptions."

34. By August 2026, however, Meta was applying its invoice mandate inconsistently across advertisers. Some Dash.fi Card holders who received the invoice mandate were nonetheless able to continue to use the Dash.fi Card for advertising on Meta's platforms beyond the arbitrary deadlines set by Meta for advertisers to stop using the Dash.fi Card. Other Dash.fi Card users who had not received any invoice mandate from Meta nonetheless were blocked from using the Dash.fi Card. Still other Dash.fi Card users were prompted to add non-Dash.fi Cards to their Meta advertising accounts for payment.

35. Ultimately, most Dash.fi Card users who received the invoice mandates, fearing Meta advertising account and campaign suspensions, quickly ceased all spending on the Dash.fi Card. This resulted in over $7 million in lost monthly card spend.

36. Other potential Dash.fi customers also ended discussions with Dash.fi after hearing from Meta representatives that the Dash.fi Card was not accepted on Meta's platforms.

37. Simultaneously from May 2026 and through summer 2026, Meta restricted Dash.fi system access by disabling access tokens Dash.fi used through its Business Manager with Dash.fi Card users' permission to connect with their Meta advertising accounts. As a result, Dash.fi lost Ad Pay Protection data necessary for auditing its clients' advertising accounts and the ability to pursue refund requests on their behalf.

### E. <u>Meta Made Disparaging and False Statements About Dash.fi</u>

38. In August 2026, Meta further escalated its Dash.fi Ban activities by outright telling advertisers that the Dash.fi Card along with cards issued by TransPecos Bank and Patriot Bank were banned on Meta's platforms. Meta's approach was in direct conflict with Mastercard rules governing merchant acceptance which mandate that a merchant that accepts Mastercard-branded cards agrees to honor all valid Mastercard cards presented for payment without discrimination on the basis of the issuing bank, subject only to limited exceptions.

39. On August 14, 2026, Meta shutdown an advertiser's account stating that the Dash.fi Card was a "Risk Payment – confirmed compromise."

40. On August 15, 2026, Meta blocked the Dash.fi Card for two of Dash.fi's biggest spenders and stated that the Dash.fi Card violates its policies.

41. On August 19, 2026, Meta blocked another advertiser's Dash.fi Card stating that Dash.fi was a "virtual bank" that did not meet Meta's verification checks and directed the advertiser to use "a credit card issued by a traditional bank." These statements were misleading at best. Dash.fi itself is not a bank, nor does it market itself as a bank. Rather, Dash.fi is the program manager for the Dash.fi Card. Furthermore, the card issuer banks for the Dash.fi Card, TransPecos Bank and Patriot Bank, are in fact traditional banks.

42. By August 20, 2026, Meta stopped accepting the Dash.fi Card across multiple advertisers' accounts serving them with error messages when they tried to use the card.

43. By August 28, 2026, Dash.fi determined that Meta had blocked all existing BINs



Glaser Weil

associated with the Dash.fi Card on Meta's platforms.

44. On September 3, 2026, Meta notified certain Dash.fi Card users and former users that Dash.fi will no longer be accepted on Meta going forward and credit cards issued by TransPecos Bank or Patriot Bank would "no longer be supported for ads payments."

45. By September 5, 2026, Meta suspended the advertising accounts of Dash.fi's top cardholder spenders. A Meta representative informed one of these advertisers that suspension was caused by the advertiser's use of the Dash.fi Card calling it a "suspicious payment method" and instructed the advertiser to "use a clean payment method or switch to Line of Credit."

### F. Meta Formally Banned Dash.fi and Threatened Legal Action

46. By September 7, 2026, Dash.fi suspected Meta was specifically targeting Dash.fi. Meta blocked advertisers from adding new Dash.fi Cards to accounts and blocked existing Dash.fi Cards on advertiser accounts. Meta sent these advertisers messages saying that the Dash.fi Card is a blocked payment method when they tried to add new Dash.fi Cards with existing BINs to their accounts.

47. On September 11, 2026, Meta sent a formal communication to Dash.fi Card users and former card users stating that on October 5, 2026, cards issued by TransPecos Bank and Patriot Bank will no longer be accepted as a payment method for ads on Meta's platforms.

48. On September 23, 2026, Dash.fi's suspicions that Meta was targeting it were confirmed when Meta restricted Dash.fi's Business Manager and ad accounts and cut API access for Ad Pay Protection. Meta notified Dash.fi of its actions by email stating in one:

> We restricted your business…It looks like you are taking part in behaviour, either with a group of accounts or by yourself, that tries to find a way around our rules. This goes against our Advertising Standards on Account Integrity.

Meta immediately denied Dash.fi's appeal.

49. Meta also disabled the personal Facebook and Instagram accounts of Dash.fi employees and contractors on September 23, 2026, and informed them that all data associated with the accounts would be permanently lost after 30 days.

50. On September 24, 2026, outside counsel for Meta sent a letter entitled "Cease and



Glaser Weil

Desist Abuse of Meta – Dash.fi" addressed to Dash.fi and six Dash.fi employees and contractors. In the letter, Meta accused Dash.fi of "engaging in unlawful financial practices in collusion with TransPecos Banks [by] operat[ing] a systematic schedule designed to deprive Meta of … revenue … by partnering with TransPecos Banks to facilitate mass unauthorized chargebacks for advertising services delivered to Meta's commercial customers." Meta further accused Dash.fi of violating various federal and state laws and stated that all agents and employees acting on Dash.fi's behalf are not permitted to access Meta's platforms for any reason whatsoever.

51. The letter further demanded that Dash.fi respond within 48 hours with, among other things, a complete list of all BINs associated with Dash.fi Cards, all Dash.fi Card numbers associated with Meta advertiser accounts, an accounting of all chargeback disputes with Meta, and a promise to disgorge all revenue earned from its activities with Meta.

52. Meta's actions have had a devastating impact on Dash.fi. Monthly Meta advertising spend on the Dash.fi Card which peaked at approximately $97 million in April 2026 fell to approximately $64 million by September 2026. Measured against each customer's best month in 2026, Dash.fi's customers had removed more than $120 million per month of Meta spend from the Dash.fi Card by September 2026. Meta's announced refusal to accept any Dash.fi Card from October 5, 2026, is expected to reduce the remaining on-card Meta spend to zero.

53. Since spring of 2026, hundreds of Dash.fi Card users simply stopped using the Dash.fi Card due to Meta's retaliatory conduct. Many have expressed concern directly to Dash.fi itself and other advertisers and potential Dash.fi customers over use of the Dash.fi Card and association with Dash.fi.

**<u>FIRST CAUSE OF ACTION</u>**

**UNFAIR COMPETITION – FALSE ADVERTISING**

**(Lanham Act § 43(a), 15 U.S.C. § 1125(a)(1))**

54. Dash.fi realleges and incorporates by reference the allegations of paragraphs 1 through 53 above as though fully set forth herein.

55. Dash.fi and Meta are persons within the meaning of 15 U.S.C. § 1127.

56. Meta's platform notices, account communications, and messages to advertisers concerning the availability and terms of advertising on Meta's platforms constitute commercial advertising or promotion within the meaning of 15 U.S.C. § 1125(a)(1)(B).

57. In those communications, Meta made false or misleading statements of fact about Dash.fi and the Dash.fi Card, including that the Dash.fi Card was a "confirmed compromise," a "suspicious payment method," and the product of a "virtual bank" that fails Meta's verification, and that Dash.fi and its customers violated Meta's policies. Each statement was false when made.

58. Meta's false statements actually deceived, or had a tendency to deceive, a substantial segment of the intended audience—Dash.fi's customers and prospective customers—and were material to their purchasing and payment decisions. Customers who received these statements switched to alternative payment methods, ceased using the Dash.fi Card, or declined to adopt it.

59. Meta's statements were disseminated to actual and prospective advertisers in interstate commerce and affected commercial transactions across state lines.

60. As a direct and proximate result of Meta's false and misleading statements, Dash.fi has suffered and will continue to suffer injury, including reputational harm, loss of goodwill, loss of customers, lost revenues and profits, and diversion of business.

61. Meta's false statements were willful. Meta made them with knowledge of Dash.fi's business, its customer relationships, and the identities of the specific advertisers to whom the statements were directed. Meta acted with specific intent to disrupt Dash.fi's business and with full knowledge that its statements would cause Dash.fi's customers to abandon the Dash.fi Card.

62. This is an exceptional case within the meaning of 15 U.S.C. § 1117(a). Dash.fi is entitled to an award of its reasonable attorneys' fees, to Meta's profits, and to enhanced damages of up to three times its actual damages.

63. Unless enjoined, Meta will continue to disseminate false and misleading statements, causing further immediate and irreparable harm to Dash.fi for which there is no adequate remedy at law.

Glaser Weil

## SECOND CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

64. Dash.fi realleges and incorporates by reference the allegations of paragraphs 1 through 63 above.

65. Dash.fi maintained valid and enforceable contracts with Dash.fi Card users under which those cardholders were authorized and expected to use the Dash.fi Card to purchase advertising on Meta's platforms. Those contracts generated interchange revenue, transaction fees, and other economic benefits for Dash.fi.

66. Meta knew the contracts existed. Meta processed payment transactions submitted by advertisers using the Dash.fi Card, regularly interacted with those advertisers, and knew they maintained ongoing cardholder relationships with Dash.fi.

67. Despite that knowledge, Meta intentionally interfered with those contracts by:

a. Falsely representing to Dash.fi Card users that the Dash.fi Card was a "Risk Payment – confirmed compromise," a "suspicious payment method," and the product of a "virtual bank" that failed Meta's required verification—statements Meta knew were misleading;

b. Declining Dash.fi Card payments submitted by advertisers and directing those advertisers to consult with the card issuer;

c. Instructing Dash.fi Card users that they could no longer use the Dash.fi Card on Meta's platforms and that they must instead transition to ACH payments or apply for a Meta-issued credit line;

d. Blocking advertisers from using the Dash.fi Card as a payment method on Meta's platforms;

e. Switching advertisers' selected payment method from the Dash.fi Card to backup credit cards saved to their Meta advertising accounts, without those advertisers' knowledge or consent;

f. Refunding charges run on the Dash.fi Card and immediately re-running the refunded charges on backup credit cards without those advertisers' knowledge or

consent; and

g. Disabling Dash.fi's API and access to Meta accounts preventing Dash.fi from (i) auditing ad traffic and identifying invalid traffic and fraudulent clicks for its customers running ads through Meta's platforms, and (ii) the ability to submit notices to Meta of those fraudulent clicks and invalid traffic.

68. Meta acted without privilege, justification, or lawful business necessity. Its actions were independently wrongful because Meta undertook them to eliminate advertisers' ability to dispute fraudulent charges through Dash.fi's chargeback procedures.

69. Meta acted deliberately and purposefully. It knew that blocking the Dash.fi Card would disrupt Dash.fi's performance of Ad Pay Protection services under the existing Cardholder Agreements and prevent advertisers from using the card as those relationships contemplated.

70. As a direct result, advertisers could not perform their obligations under their contracts with Dash.fi. Meta's conduct caused lost transaction volume, lost interchange and program revenue, customer attrition, and increased servicing costs.

71. Dash.fi has suffered damage to its business and contractual relationships in an amount to be proven at trial. Injunctive relief is also necessary to prevent further irreparable harm.

72. Meta's conduct was malicious, oppressive, and in conscious disregard of Dash.fi's rights, entitling Dash.fi to punitive damages under California Civil Code § 3294.

## **THIRD CAUSE OF ACTION**

## **TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

73. Dash.fi realleges and incorporates by reference the allegations of paragraphs 1 through 72 above.

74. Dash.fi had prospective contractual and economic relationships with current and potential Dash.fi Card users, as well as with advertising agencies and other third parties. Dash.fi had a reasonable expectation that those relationships would yield future economic benefits, including interchange revenue, program fees, and expanded business opportunities.

75. Meta knew of Dash.fi's prospective customer and business relationships. With that

knowledge, Meta intentionally engaged in wrongful conduct designed to disrupt those relationships, including:

a. Falsely representing to Dash.fi Card users that the Dash.fi Card was a "Risk Payment – confirmed compromise," a "suspicious payment method," and the product of a "virtual bank" that failed Meta's required verification—statements Meta knew were misleading;

b. Declining Dash.fi Card payments submitted by advertisers and directing those advertisers to consult with the card issuer;

c. Instructing Dash.fi Card users that they could no longer use the Dash.fi Card on Meta's platforms and that they must instead transition to ACH payments or apply for a Meta-issued credit line;

d. Blocking advertisers from using the Dash.fi Card as a payment method on Meta's platforms;

e. Switching advertisers' selected payment method from the Dash.fi Card to backup credit cards saved to their Meta advertising accounts, without those advertisers' knowledge or consent;

f. Refunding charges run on the Dash.fi Card and immediately re-running the refunded charges on backup credit cards without those advertisers' knowledge or consent; and

g. Disabling Dash.fi's API and access to Meta accounts preventing Dash.fi from (i) auditing ad traffic and identifying invalid traffic and fraudulent clicks for its customers running ads through Meta's platforms, and (ii) the ability to submit notices to Meta of those fraudulent clicks and invalid traffic.

76. Meta's conduct was independently wrongful apart from the interference itself. It was anticompetitive, retaliatory, and specifically designed to eliminate advertisers' ability to dispute fraudulent charges through Dash.fi's platform.

77. As a direct and proximate result, numerous advertisers declined to obtain the Dash.fi

Glaser Weil

Card, reduced their use of it, discontinued discussions, or shifted expenditures to competing products. Dash.fi has suffered loss of prospective revenue, loss of customers and prospective customers, loss of goodwill, and other economic damages.

78. Dash.fi has suffered economic harm in an amount to be proven at trial. Injunctive relief is also necessary to prevent further irreparable harm.

79. Meta acted intentionally, willfully, and maliciously, knowing Dash.fi would suffer economic harm.

**FOURTH CAUSE OF ACTION**

**Unfair Competition**

**(Cal. Bus. & Prof. Code § 17200, *et seq.)***

80. Dash.fi realleges and incorporates by reference the allegations of paragraphs 1 through 79 above.

81. Meta has engaged in unlawful, unfair, and deceptive business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., including:

a. Blocking the Dash.fi Card to suppress chargeback disputes regarding invalid traffic and fraudulent clicks, thereby shifting the costs of fraud to advertisers;

b. Making false, misleading, and mutually inconsistent statements to advertisers about the Dash.fi Card to move them onto Meta's own competing credit product;

c. Restricting Dash.fi's business accounts and API access on a pretextual "Account Integrity" rationale to disable the Ad Pay Protection platform; and

d. Refusing to consider documented invalid-traffic refund claims submitted by Dash.fi without substantive review despite suggesting disputes be resolved through an internal claims channel that Meta had no intent to review.

82. Meta's conduct is "unlawful" under the UCL because it violates independent legal duties, including Section 43(a) of the Lanham Act, California common-law proscriptions against intentional and negligent interference with economic relations, California's False Advertising Law

(Bus. & Prof. Code § 17500 et seq.), and the Mastercard Rules governing merchant acceptance.

83. Meta's conduct is independently "unfair" within the meaning of the UCL because it intentionally blocked the Dash.fi Card to suppress legitimate chargeback disputes, foreclosing consumer choice and distorting competition among payment-card issuers without countervailing benefits. The harm to Dash.fi and to market competition is substantial, not reasonably avoidable by Dash.fi, and not outweighed by any legitimate business justification.

84. Meta's conduct is "fraudulent" within the meaning of the UCL because it is likely to deceive reasonable advertisers by concealing the true reasons for banning the Dash.fi Card and by implying that the ban is neutral, operational, or security-related when its purpose is to prevent chargeback disputes relating to invalid-traffic charges.

85. As a direct result of Meta's conduct, Dash.fi has suffered injury in fact and lost money and property, including lost business, lost interchange fees, lost chargeback-recovery revenue, reputational harm, and diminution in goodwill. Dash.fi has standing under the UCL.

86. Under the UCL, this Court has broad equitable powers to remedy Meta's unlawful practices and prevent future misconduct. Injunctive relief is particularly necessary given the ongoing harm to competition. Damages alone will not deter Meta's behavior or restore the market.

## PRAYER FOR RELIEF

WHEREFORE, Dash.fi prays for relief, as follows:

1. A judgment that Meta has:

   a. engaged in false advertising and unfair competition in violation of the Lanham Act;

   b. tortiously interfered with Dash.fi's contractual relations;

   c. tortiously interfered with Dash.fi's prospective economic relations;

   d. engaged in unfair, unlawful, and fraudulent business practices in violation of California's UCL; and

   e. acted willfully and with malice, oppression, and/or fraud;

2. A preliminary and permanent injunction against Meta and all of its affiliates,



Glaser Weil

employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them:

a. requiring Meta to restore acceptance of the Dash.fi Card on its advertising platforms on non-discriminatory terms;

b. requiring Meta to remove restrictions on BINs associated with the Dash.fi Card;

c. requiring Meta to restore Dash.fi's business accounts, API access, and its employees' personal accounts, and to preserve all associated data;

d. enjoining Meta from making further false or misleading statements about Dash.fi or the Dash.fi Card;

e. requiring Meta to issue corrective communications to advertisers and partners sufficient to remedy the effects of its prior statements; and

f. granting such other injunctive relief as the Court deems necessary to prevent irreparable harm;

3. Actual damages suffered as a result of Meta's unlawful conduct, including lost revenues, lost profits, and harm to reputation and goodwill, in an amount to be proven at trial, plus all pre-judgment and post-judgment interest at the maximum rate permitted by law;

4. Treble damages under 15 U.S.C. § 1117(a);

5. Punitive and exemplary damages under California Civil Code § 3294;

6. Reasonable attorneys' fees under 15 U.S.C. § 1117(a);

7. Costs of suit; and

8. Such other and further relief as the Court deems just and proper.

DATED: September 30, 2026

GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP

By: ______________________________

JEFF K. JOYNER
PETER M. BRANSTEN
GIANNA SEGRETTI
ROBERTO C. ARBULU

*Attorneys for Plaintiff*
*DASH.FI TECHNOLOGIES INC.*

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dash.fi respectfully demands a trial by jury on all issues triable by jury.

DATED: September 30, 2026

GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP

By: ______________________________
JEFF K. JOYNER
PETER M. BRANSTEN
GIANNA SEGRETTI
ROBERTO C. ARBULU

*Attorneys for Plaintiff*
*DASH.FI TECHNOLOGIES INC.*