JEFF K. JOYNER (SBN 180485)
jjoyner@glaserweil.com
GIANNA SEGRETTI (SBN 323645)
gsegretti@glaserweil.com
ROBERTO C. ARBULU (SBN 340381)
rarbulu@glaserweil.com
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
Phone: (310)553-3000
Fax: (310) 556-2920

PETER M. BRANSTEN (SBN 113352)
pbransten@glaserweil.com
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Phone: (415) 510-4815
Fax: (415) 510-4790

*Attorneys for Plaintiff*
*DASH.FI TECHNOLOGIES INC.*

Glaser Weil

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DASH.FI TECHNOLOGIES INC.,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., a Delaware corporation,<br><br>Defendant. | CASE NO.: 3:26-cv-11130-RFL<br><br>Hon. Rita F. Lin<br><br>**PLAINTIFF DASH.FI TECHNOLOGIES INC.'S MEMORANDUM IN SUPPORT OF ITS *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

A. The Dash.fi Card ..... 2

B. Meta Engages in Systematic Fraudulent Billing Practices ..... 3

C. Meta Initiated Invisible Declines of the Dash.fi Card ..... 4

D. Meta Mandated Dash.fi Card Users Move to Monthly Invoicing ..... 6

E. Meta Made Disparaging and False Statements About Dash.fi ..... 7

F. Meta Formally Banned Dash.fi and Threatened Legal Action ..... 8

III. ARGUMENT ..... 10

A. DASH.FI IS LIKELY TO SUCCEED ON THE MERITS ..... 11

1. Meta's False Advertising Violates the Lanham Act. ..... 11

2. Meta Has Interfered with Dash.fi's Existing Contracts and Prospective Economic Relations. ..... 15

3. Meta's Conduct Violates California's Unfair Competition Law. ..... 17

B. DASH.FI HAS SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ..... 18

1. Dash.fi Is Entitled to a Rebuttable Presumption of Irreparable Harm ..... 19

2. Meta Has Already Compromised Dash.fi's Reputation and Goodwill ..... 19

3. Dash.fi Will Be Destroyed Absent Injunctive Relief ..... 22

4. The Balance of Equities Tips Sharply in Dash.fi's Favor ..... 23

C. THE PUBLIC INTEREST FAVORS AN INJUNCTION ..... 24

D. NO BOND SHOULD BE REQUIRED ..... 25

IV. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

### CASES

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ........ 10

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ........ 22

*Am. Trucking Ass'n v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ........ 10

*Baron App, Inc. v. OpenAI, Inc.*,
820 F. Supp. 3d 881 (N.D. Cal. 2026) ........ 19

*Clorox Co. v. Reckitt Benckiser Grp. PLC*,
398 F. Supp. 3d 623 (N.D. Cal. 2019) ........ 14, 15

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
173 F.3d 725 (9th Cir. 1999) ........ 12, 13

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
479 F.3d 1099 (9th Cir. 2007) ........ 15, 16

*CTIA - The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ........ 23

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
11 Cal. 4th 376 (1995) ........ 15

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
356 F.3d 1256 (10th Cir. 2004) ........ 19

*Du-Phillips v. Citibank, N.A.*, No. CV 25-00034 JAO-RT,
2025 WL 1615329, at *10 (D. Haw. June 5, 2025) ........ 16

*eMove Inc. v. SMD Software Inc.*, No. CV-10-02052-PHX-JRG,
2012 WL 1379063, at *8 (D. Ariz. Apr. 20, 2012) ........ 13

*F.T.C. v. Inc21.com Corp.*,
688 F. Supp. 2d 927 (N.D. Cal. 2010) ........ 24

*Facebook, Inc. v. BrandTotal Ltd.*,
499 F. Supp. 3d 720 (N.D. Cal. 2020) ........ 20

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
314 F.3d 48 (2d Cir. 2002) ........ 13

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*,
415 U.S. 423 (1974) ........ 10

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*,
193 F. Supp. 3d 556 (E.D. Va. 2016) .......... 14

*Henry Schein, Inc. v. Cook*,
191 F. Supp. 3d 1072 (N.D. Cal. 2016) .......... 18

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) .......... passim

*Ingrid & Isabel, LLC v. Baby Be Mine, LLC*,
70 F. Supp. 3d 1105 (N.D. Cal. 2014) .......... 17

*ITEX Corp. v. Global Links Corp.*,
90 F. Supp. 3d 1158 (D. Nev. 2015) .......... 12, 13

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
299 F.3d 1242 (11th Cir. 2002) .......... 14

*Jorgensen v. Cassiday*,
320 F.3d 906 (9th Cir. 2003) .......... 25

*Kotok v. Homecomings Fin., LLC*, No. C09-662RSM,
2009 WL 1652151, at *2 (W.D. Wash. June 12, 2009) .......... 18

*Nat'l Urb. League v. Ross*,
484 F. Supp. 3d 802 (N.D. Cal. 2020) .......... 10

*Navigant Consulting, Inc. v. Milliman, Inc.*, No. C18-1154JLR,
2018 WL 3751983, at *4 (W.D. Wash. Aug. 8, 2018) .......... 25

*NJOY, LLC v. iMiracle (HK) Ltd.*,
760 F. Supp. 3d 1070 (S.D. Cal. 2024) .......... 17, 18

*Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*,
181 F.4th 961 (9th Cir. 2026) .......... 19, 20

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
310 F. Supp. 3d 1089 (S.D. Cal. 2018) .......... 14

*OpenAI, Inc. v. Open A.I., Inc.*,
719 F. Supp. 3d 1033 (N.D. Cal. 2024) .......... 19

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
50 Cal. 3d 1118 (1990) .......... 15

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
131 F.4th 205 (4th Cir. 2025) .......... 17

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) .......... 19, 20, 21

*Schering Corp. v. Pfizer Inc.*,
189 F.3d 218 (2d Cir. 1999) .......... 11

*Shippers, a Div. of Illinois Tool Works, Inc. v. Fontenot*, No. 13CV1349 JLS (MDD)



Glaser Weil

(S.D. Cal. Sept. 23, 2013) ........................................ 19

*Smart Inventions, Inc. v. Allied Commc'ns Corp.*, 94 F. Supp. 2d 1060 (C.D. Cal. 2000) ........................................ 14

*Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700 (2001) ........................................ 18

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997) ........................................ 11, 12, 15

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ........................................ 24

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ........................................ 10, 19, 20

*Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC*, 519 F. Supp. 3d 839 (D. Or. 2021) ........................................ 11, 13

*Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804 (9th Cir. 1963) ........................................ 10

*TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011) ........................................ 14

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099 (C.D. Cal. 2001) ........................................ 18

*William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255 (9th Cir. 1995) ........................................ 12

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ........................................ 2, 10

*Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082 (N.D. Cal. 2014) ........................................ 18

*Zeltiq Aesthetics, Inc. v. BTL Indus., Inc.*, 32 F. Supp. 3d 1088 (N.D. Cal. 2014) ........................................ 17

## **STATUTES**

15 U.S.C. § 1116(a) ........................................ 19

Cal. Bus. & Prof. Code § 17200 ........................................ 17

Glaser Weil

# I. INTRODUCTION

Dash.fi Technologies Inc. ("Dash.fi") is a financial-technology company that services a Mastercard-branded corporate credit card ("Dash.fi Card") for digital advertisers. Its flagship Ad Pay Protection feature audits advertising spend on Meta Platforms, Inc.'s ("Meta") platforms for fraudulent clicks and invalid traffic and submits refund requests and Mastercard chargeback disputes on behalf of its users against Meta—which offers no meaningful alternative for disputing invalid and fraudulent charges. Dash.fi has successfully recovered [redacted] on behalf of its card users in fraudulent Meta charges to date.

Rather than address fraud on its platform, Meta secretly waged a retaliation campaign against Dash.fi's success. This campaign did not become clear to Dash.fi until September 23 and 24, 2026, when Meta blocked Dash.fi's API and Dash.fi's business account—as well as the personal Meta accounts of six of Dash.fi's employees—and sent Dash.fi a cease-and-desist letter demanding that Dash.fi abandon all activity on its platforms. It is now clear to Dash.fi, that in the preceding months, Meta purposefully targeted Dash.fi by declining Dash.fi cards at the point of sale, blocking Dash.fi's bank identification numbers ("BINs"), making false statements to Dash.fi customers, and steering advertisers from the Dash.fi Card to Meta's credit line.

Meta recently announced that on October 5, 2026, it will stop accepting all cards issued through TransPecos Bank and Patriot Bank, the only BINs through which Dash.fi processes its card transactions. Meta's action will therefore cut off Dash.fi's primary revenue stream and render its card product worthless for most of its customers—a date-certain extinction event. Meta has also caused ongoing reputational harm through false and misleading statements that have driven away existing and prospective customers.

Dash.fi seeks emergency relief on three grounds. *First*, Meta should be required to stop refusing the Dash.fi Card and restore it to the standing of similarly situated Mastercard-branded

payment instruments. *Second*, Meta should discontinue making and retract all false and misleading statements about Dash.fi and the Dash.fi Card. *Third*, Meta should restore Dash.fi's access to its platforms, including Business Manager, advertising accounts, API access, and employees' and contractors' platform accounts. Without relief, Dash.fi will suffer irreparable harm before adjudication on the merits.

This case is on all fours with *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022), where the Ninth Circuit affirmed an injunction requiring a dominant platform to continue granting access to a smaller company whose business depended on that access. As in *LinkedIn*, Dash.fi faces the "risk of irreparable harm . . . [from] the possibility that its business would be effectively destroyed" if relief is denied. *Id.* at 1188. The balance of equities and public interest likewise favor preserving competition and protecting consumers from fraudulent advertising charges.

Under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the Court should grant a temporary restraining order because Dash.fi can show that it "is likely to succeed on the merits, that [Dash.fi] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [Dash.fi's] favor, and that an injunction is in the public interest." *Id.* at 20. Meta's conduct violates federal and state unfair competition law, constitutes tortious interference and unfair competition, and threatens irreversible destruction of Dash.fi's business. The balance of hardships and public interest favor relief protecting advertisers from fraudulent clicks.

## II. <u>FACTUAL BACKGROUND</u>

### A. <u>The Dash.fi Card</u>

Dash.fi developed and manages the Dash.fi Card, a Mastercard-branded corporate credit card issued by TransPecos Bank, a state-chartered bank, and Patriot Bank, N.A. Johnson Decl., ¶¶ 1-5, Exhs. A-C. The card is designed for digital advertisers purchasing advertising on platforms such as Meta's Facebook and Instagram. Customers use the card to pay for advertising and receive access to

Glaser Weil

Ad Pay Protection, a proprietary feature that enables Dash.fi to scrutinize advertising charges billed by platforms such as Meta. Johnson Decl., ¶ 7.

Under the Dash.fi Cardholder Agreement and Ad Pay Protection Terms and Conditions, users authorize Dash.fi to issue, manage, and maintain virtual payment cards associated with their Meta advertising accounts and to seek refunds and recoveries on their behalf. Johnson Decl., ¶¶ 7-10, Exhs. D, E. Ad Pay Protection identifies charges attributable to invalid traffic, including bot-generated clicks, zero-bounce sessions, out-of-geo delivery, and non-human impressions. Dash.fi submits refund requests to the advertising platform. Johnson Decl., ¶¶ 13-16. If the platform denies or ignores a request, Dash.fi, with cardholder permission, escalates the disputed charge through Mastercard's chargeback process. Johnson Decl., ¶ 15. [redacted], ¶ 21. [redacted]. *Id.*

**B. <u>Meta Engages in Systematic Fraudulent Billing Practices</u>**

Meta's Facebook and Instagram platforms command such a large share of the digital-advertising market that most businesses seeking meaningful online reach have no practical alternative. That dominance gives Meta extraordinary leverage over advertisers, who must accept its billing practices, payment terms, and dispute procedures to advertise on the platforms.

Despite Meta's public commitments to third-party verification of advertising data, it systematically bills advertisers for invalid clicks and traffic outside campaign parameters. Dash.fi's audits—conducted using tracking data captured on its cardholders' own websites and reconciled against the clicks and charges Meta reported for the same campaigns—have consistently identified invalid traffic across Dash.fi's cardholder base. Johnson Decl., ¶ 14. Between October 2025 and June 2026, Dash.fi found that approximately 2.4% to 3.5% of charges incurred derived from invalid traffic.





Glaser Weil

*Id.*

### C. Meta Initiated Invisible Declines of the Dash.fi Card

In January 2025, Dash.fi began auditing Meta advertising traffic for its cardholders and identifying charges attributable to fraudulent clicks or invalid traffic. Johnson Decl., ¶ 17. Dash.fi then submitted refund requests to Meta, which immediately rejected or ignored nearly all such requests. *Id.*

By spring 2025, Meta began declining Dash.fi Card charges for certain advertisers without explanation and directing cardholders to contact the issuer. Johnson Decl., ¶ 23. The declines were invisible to Dash.fi. *Id.* When Dash.fi and advertisers asked Meta about them in March 2025, a Meta representative said that "due to policy restrictions [they were] unable to share the specific reason for the declined payment[s]." Johnson Decl., ¶ 24.

In April 2025, advertisers also reported difficulty adding the Dash.fi Card to their accounts. Johnson Decl., ¶ 25. In mid-2025, because Meta was ignoring refund requests, Dash.fi began initiating chargeback disputes against Meta on behalf of advertisers, as expressly authorized by Dash.fi Card users via the Dash.fi Cardholder Agreement and Ad Pay Protection Terms and Conditions. Johnson Decl., ¶ 18.

By July 2025, Ad Pay Protection also focused on setting preventive IP blocking and negative-audience exclusions for its cardholders through Meta's API to exclude known IP addresses connected with bot accounts and traffic based on its auditing of ad traffic. Johnson Decl., ¶ 16. Prior to Ad Pay Protection, advertisers had generally avoided adding exclusions to established campaigns because doing so could trigger compliance review and reset Meta's learning algorithm for their accounts. *Id.*

Dash.fi also has discovered that within days or weeks of a chargeback dispute being initiated on a Dash.fi Card, Meta spend on that card would stop. Johnson Decl., ¶ 22.

Under Mastercard's rules, Meta had the opportunity to contest each chargeback through a

second presentment. If Dash.fi then pursued pre-arbitration, Meta could carry the dispute to a decision by Mastercard. Johnson Decl., ¶¶ 19, 20, Ex. F. [redacted] Johnson Decl., ¶ 21. Meta contested most of the remainder through second presentments. *Id.* [redacted] *Id.* [redacted] *Id.* [redacted] *Id.*

By July 2025, Meta began blocking BINs associated with Dash.fi Cards, disrupting spend by Dash.fi's highest-spending cardholders. Johnson Decl., ¶ 27. Meta gave no notice or acknowledgment. *Id.* Users could continue using other cards but could neither use saved Dash.fi Cards nor add new cards with the same BINs. Dash.fi could replace blocked cards with cards issued under new BINs. *Id.*

In September 2025, Meta began switching Dash.fi Card users to backup cards saved to their accounts without notice and auto-declining the Dash.fi Card without sending decline notices to Dash.fi. Johnson Decl., ¶ 28.

By October 2025, Meta was declining Dash.fi Cards across many high-spend accounts. Dash.fi saw no problem with the card numbers and could not see the declines. Johnson Decl., ¶ 29. Mastercard assured Dash.fi and its users that "the BIN [associated with the declined cards] appear[ed] very healthy with the merchant…" but said the declines appeared to be due to fraud. Johnson Decl., ¶¶ 29, 30, Ex. H.

In October 2025, Meta declined Dash.fi Card charges for a user [redacted] and said the declines were "on the processing side and not [Meta's]." Johnson Decl., ¶¶ 31, 32, Ex. I. Dash.fi saw no declines, and Mastercard found no problem on its side. *Id.* The user feared that replacing the card would trigger a fraud alert and shut down the account, so it stopped using the

Dash.fi Card and ended its relationship with Dash.fi. *Id.*

On December 18, 2025, without notice to the advertiser, Meta refunded 29 Dash.fi Card charges and re-billed them to another card saved to the account. Johnson Decl., ¶ 33. When questioned, Meta directed the advertiser to "contact the payment provider." *Id.* Dash.fi did not know why Meta had taken such action. *Id.*

By February 2026, Dash.fi, still not knowing the root cause of card declines and BIN blocks on Meta's platforms, formally provided cardholders a white-glove service rotating Dash.fi Cards saved to their Meta accounts. Johnson Decl., ¶ 34. But by March 2026, Meta was declining the cards even faster. *Id.*

In May 2026, one advertiser reported that Meta immediately banned its advertising account after it linked a Dash.fi Card. Johnson Decl., ¶¶ 37, 38, Ex. K. Many users stopped using the card and told Dash.fi they were ending their business relationships because of Meta's continuing blocks. Johnson Decl., ¶ 38.

### D. Meta Mandated Dash.fi Card Users Move to Monthly Invoicing

In February and March 2026, Meta told cohorts of Dash.fi Card users to switch by a stated deadline to monthly invoicing offered through Meta payable only by ACH. Johnson Decl., ¶ 39. Meta also said it would no longer accept credit cards for their advertising accounts. *Id.* Account notices and Meta billing representatives warned that advertisers had to switch payment methods by the deadline to avoid disruption to their accounts and campaigns. *Id.*

With Dash.fi's assistance, several Ad Pay Protection users sent Meta representatives letters asking to continue using the Dash.fi Card or receive deadline extensions. Johnson Decl., ¶¶ 40, 41, Ex. L. Meta's outside counsel responded that the monthly-invoicing decision was final, with "no exceptions." *Id.* By August 2026, Meta applied the mandate inconsistently. Johnson Decl., ¶ 42. Some users who received it continued using the Dash.fi Card after Meta's deadlines, and others who

Glaser Weil

received no mandate were blocked from using the card. Still others were prompted to add non-Dash.fi cards. *Id.* Most users who received the mandate nonetheless stopped spending on the Dash.fi Card, fearing suspension of their Meta accounts and campaigns. *Id.* [redacted]. Other prospective Dash.fi customers also ended onboarding discussions after Meta representatives told them that the Dash.fi Card was not accepted on Meta's platforms. Johnson Decl., ¶ 44.

From May 2026 through summer 2026, Meta also restricted Dash.fi's system access by disabling tokens Dash.fi used through Business Manager with its users' permission to connect to their Meta advertising accounts. Johnson Decl., ¶ 45. Dash.fi thereby lost the Ad Pay Protection data needed to audit accounts and pursue refund requests. *Id.*

**E. Meta Made Disparaging and False Statements About Dash.fi**

In August 2026, Meta escalated its ban campaign by telling advertisers that the Dash.fi Card and cards issued by TransPecos Bank and Patriot Bank were banned on Meta's platforms. Johnson Decl., ¶ 46. Meta's approach was in direct conflict with Mastercard rules governing merchant acceptance which mandate that a merchant that accepts Mastercard-branded cards agrees to honor all valid Mastercard cards presented for payment without discrimination on the basis of the issuing bank, subject only to limited exceptions. Johnson Decl., ¶¶ 35, 36, Ex. J. Dash.fi has now learned of numerous instances in August and September 2026 when Meta made disparaging and false statements about Dash.fi and the Dash.fi Card including, without limitation, the following representative sample.

On August 14, 2026, Meta shut down an advertiser's account, stating that the Dash.fi Card was a "Risk Payment – confirmed compromise." Johnson Decl., ¶ 47, Ex. M.

On August 15, 2026, Meta blocked the Dash.fi Card for two of Dash.fi's largest spenders and said that the card violated its policies. Johnson Decl., ¶ 48.

On August 19, 2026, Meta blocked another advertiser's Dash.fi Card, stating that Dash.fi was

a "virtual bank" that did not meet Meta's verification checks and directing the advertiser to use "a credit card issued by a traditional bank." Johnson Decl., ¶ 49. The statements were misleading. Dash.fi is not a bank and does not market itself as one. Johnson Decl., ¶¶ 3, 50. It is the program manager for a card issued by TransPecos Bank and Patriot Bank, both of which are in fact traditional banks. Johnson Decl., ¶¶ 3-6, Exhs. A-C.

By August 20, 2026, Meta had stopped accepting the Dash.fi Card across multiple advertiser accounts and displayed error messages when users attempted to use it. Johnson Decl., ¶ 52.

By August 28, 2026, Dash.fi determined that Meta had blocked every existing BIN associated with the Dash.fi Card. Johnson Decl., ¶ 53.

On September 3, 2026, Meta notified certain current and former users that Dash.fi would no longer be accepted on Meta and that cards issued by TransPecos Bank or Patriot Bank would "no longer be supported for ads payments." Johnson Decl., ¶ 54.

By September 5, 2026, Meta had suspended the advertising accounts of Dash.fi's top-spending cardholders. Johnson Decl., ¶¶ 57, 61. A representative attributed one suspension to use of the Dash.fi Card, calling it a "suspicious payment method" and instructing the advertiser to "use a clean payment method or switch to Line of Credit." Johnson Decl., ¶¶ 61, 62, Ex. Q.

**F. <u>Meta Formally Banned Dash.fi and Threatened Legal Action</u>**

It is now undisputed that Meta has engaged in a campaign specifically targeting Dash.fi that culminated when Meta blocked advertisers from adding new Dash.fi Cards and blocked existing cards on advertiser accounts. Johnson Decl., ¶ 53. When users tried to add cards with existing BINs, Meta said the Dash.fi Card was a blocked payment method. *Id.*

Beginning on September 11, 2026, Meta told current and former Dash.fi Card users that, beginning October 5, 2026, cards issued by TransPecos Bank and Patriot Bank would no longer be accepted for advertising on Meta's platforms. Johnson Decl., ¶ 55.

On September 23, 2026, Meta confirmed directly to Dash.fi, for the first time, that it had been targeting Dash.fi when Meta restricted Dash.fi's Business Manager and advertising accounts and cut API access for Ad Pay Protection. Meta emailed Dash.fi:

> We restricted your business…It looks like you are taking part in behaviour, either with a group of accounts or by yourself, that tries to find a way around our rules. This goes against our Advertising Standards on Account Integrity.

Johnson Decl., ¶¶ 71-73, Ex. V. Meta immediately denied Dash.fi's appeal for Meta to reinstate the accounts. Johnson Decl., ¶ 71.

On September 23, 2026, Meta also disabled the personal Facebook and Instagram accounts of Dash.fi employees and contractors and told them that all associated data would be permanently lost after 30 days. Johnson Decl., ¶ 72.

On September 24, 2026, Meta's outside counsel sent Dash.fi and six employees and contractors a letter titled "Cease and Desist Abuse of Meta – Dash.fi." Johnson Decl. ¶¶ 74-76, Ex. W. The letter accused Dash.fi of "engaging in unlawful financial practices in collusion with TransPecos Banks [by] operat[ing] a systematic schedule designed to deprive Meta of … revenue … by partnering with TransPecos Banks to facilitate mass unauthorized chargebacks for advertising services delivered to Meta's commercial customers." *Id.* It also accused Dash.fi of violating federal and state laws and stated that Dash.fi's agents and employees could not access Meta's platforms for any reason. *Id.*

The letter demanded a response within 48 hours, including a request for a complete list of Dash.fi Card BINs, all Dash.fi Card numbers associated with Meta advertiser accounts, an accounting of Meta chargebacks, and a promise to disgorge revenue earned from Dash.fi's Meta activities. Johnson Decl., ¶¶ 75, 76, Ex. W.

Meta's actions have devastated Dash.fi. Measured against each customer's best month in 2026, [redacted]

[redacted]. Since spring 2026, hundreds of users stopped using the card due to Meta's retaliation, and many expressed concerns directly to Dash.fi, other advertisers, and prospective customers over the use of the Dash.fi Card and association with Dash.fi. Johnson Decl., ¶¶ 79-81.

## III. ARGUMENT

A temporary restraining order and preliminary injunction involve "substantially identical" analysis. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 (9th Cir. 2001). To prevail the movant must show: (1) likelihood of success, on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *Winter,* 555 U.S. at 20; *see, e.g., Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th Cir. 2009). The Ninth Circuit applies a sliding scale: "a stronger showing of one element may offset a weaker showing of another." *LinkedIn,* 31 F.4th at 1188 (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). "[W]hen the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" *Id.* (quoting *Alliance for the Wild Rockies*, 632 F.3d at 1135). Here, the balance tips sharply in favor of Dash.fi.

Temporary restraining orders "'serv[e] the[ ] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.'" *Nat'l Urb. League v. Ross*, 484 F. Supp. 3d 802, 805 (N.D. Cal. 2020) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974)). "The status quo is the last uncontested status which preceded the pending controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963). Dash.fi seeks to restore the status quo before Meta began declining its cards, blocking its BINs, making false statements about Dash.fi and steering advertisers to Meta's credit line, banning Dash.fi and its employees, and demanding that

Dash.fi abandon chargeback activity. The relief sought will prevent Dash.fi from being destroyed prior to a preliminary-injunction hearing.

### A. DASH.FI IS LIKELY TO SUCCEED ON THE MERITS

#### 1. Meta's False Advertising Violates the Lanham Act.

Meta told Dash.fi's customers and prospective customers that the Dash.fi Card is "compromised," "suspicious," issued by a non-compliant "virtual bank," and subject to account bans. Johnson Decl., ¶¶ 47, 49, 51, 61, 62, Exhs. N, Q. Those statements are false and have driven advertisers to Meta's Line of Credit and other competing products. A Section 43(a) false-advertising claim requires:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC*, 519 F. Supp. 3d 839, 845–46 (D. Or. 2021) (granting TRO). Dash.fi satisfies each element.

First, Meta made false statements of fact. A statement may be "literally false, either on its face or by necessary implication, or … literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139. Literal falsity "is best supported by comparing the statement itself with the reality it purports to describe." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999). Meta told Dash.fi cardholder Larine Co.:

> Meta's payment system requires certain verification checks that some virtual banks may not support. To continue running ads, you'll need to add a payment method that supports Meta's verification requirements, such as a credit card issued by a traditional bank or another support payment method in your region.

Johnson Decl. ¶¶ 49-51, Ex. N.

Dash.fi is not a bank and does not hold itself out as one. It is the program manager for a Mastercard-branded card issued by TransPecos Bank and Patriot Bank, both traditional chartered banks. Johnson Decl. ¶ 3. Meta likewise told another Dash.fi cardholder, Ruby Labs, that its accounts were flagged for a "suspicious payment method," requiring a "clean payment method or switch to Line of Credit," *see* Johnson Decl. ¶¶ 61, 62, Ex. Q, and shut down another advertiser's account because the Dash.fi Card was a "Risk Payment – confirmed compromise." Johnson Decl. ¶ 47, Ex. M. Yet, Mastercard confirmed that the Dash.fi BINs "appear[ed] very healthy." Johnson Decl. ¶¶ 29, 30, Ex. H. Meta representatives also told Dash.fi cardholder, Charmander Media, that Dash.fi accounts had generated "bad feedback" from Meta reps who stated that Meta was banning all accounts that use the Dash.fi Card. Johnson Decl. ¶¶ 69, 70, Ex. U.

These statements are not "vague and subjective" puffery. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). Each is a "specific and measurable claim, capable of being proved false." *Id.* Whether a card is issued by a traditional bank, a BIN is "compromised," or Meta bans accounts using the card are verifiable facts. At minimum, Meta's statements are false by necessary implication because they convey that the Dash.fi Card is unsafe, fraudulent, or non-compliant. *See, e.g., ITEX Corp. v. Global Links Corp.*, 90 F. Supp. 3d 1158, 1170–71 (D. Nev. 2015). For example, the Charmander Media statement is actionable even without a direct accusation. The Lanham Act reaches "'innuendo, indirect intimations, and ambiguous suggestions'" shown by consumer misapprehension of the underlying facts. *ITEX*, 90 F. Supp. 3d at 1170 (quoting *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 257–58 (9th Cir. 1995)).

Relief is also available where an advertisement misleads or confuses consumers, even if not literally false. *Suzie's Brewery*, 519 F. Supp. 3d at 846 (quoting *Southland Sod Farms*, 108 F.3d at 1139). Here, "bad feedback" and the threat to ban every account using the card conveyed that Dash.fi and its cardholders were associated with fraud. That echoed Meta's accusation that Dash.fi facilitates

Glaser Weil

"mass unauthorized chargebacks." Johnson Decl. ¶¶ 74, 76, Ex. W. Indeed, the implication is false—cardholders expressly authorized Dash.fi's chargebacks, and Meta accepted and refunded nearly every one rather than arbitrate.

Meta's statements were made in "commercial advertising or promotion." Such representations need not appear in a classic advertising campaign. *Coastal Abstract*, 173 F.3d at 735. Informal promotion suffices if disseminated to the relevant purchasing public. *Id*. Further, "[t]he extent of distribution necessary to constitute commercial advertising or promotion in a particular case may be an elastic factor, so that a relatively modest amount of activity may be sufficient in the context of a particular case." *eMove Inc. v. SMD Software Inc.*, No. CV-10-02052-PHX-JRG, 2012 WL 1379063, at *8 (D. Ariz. Apr. 20, 2012). "In some cases, courts have found that a single communication or a handful of communications was sufficiently disseminated to the relevant purchasing public." *Id*. The touchstone is whether the statements form an organized campaign to penetrate that market. *See e.g., Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002) ("[A] cause of action might exist where a defendant maintains a well-enforced policy to disparage its competitor each time it is mentioned by a customer, if such a policy of reactive disparagement successfully reaches a substantial number of the competitor's potential customers."). Meta systematically used automated verification messages, suspension notices, in-platform errors, notices to cardholders, and sales-representative communications to target Dash.fi's market. Johnson Decl. ¶¶ 47, 49, 51 61, 62, 69, 70, Exhs. N, Q, U. That is sufficient.

Meta's statements deceived or tended to deceive. Literal falsity permits a presumption of deception, *Suzie's Brewery*, 519 F. Supp. 3d at 846; *ITEX*, 90 F. Supp. 3d at 1171, and here the record independently shows actual deception. Ruby Labs concluded, based on Meta's statements, that "other [Dash.fi Cards] run fraudulent business" and, therefore, Ruby Labs would "remove all [Dash.fi Cards] from our business manager." Johnson Decl. ¶¶ 61, 62, Ex. Q. Larine Co. likewise attributed Meta's

declines to a Dash.fi defect. Johnson Decl. ¶¶ 49, 51, Ex. N; *see Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 574 (E.D. Va. 2016), *aff'd*, 700 F. App'x 251 (4th Cir. 2017) (finding actual deception where recipients acted on the challenged email by withdrawing the plaintiff's product, suspending sales during an investigation, and delaying rollout).

The deception was material. Falsity creates a presumption of materiality. *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d 1089, 1124 (S.D. Cal. 2018). Independently, Meta's statements concerned the card's core qualities—whether it works and is safe—and were made when advertisers selected payment methods. *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 (N.D. Cal. 2019) ("A plaintiff can also establish materiality by showing that 'the defendants misrepresented an inherent quality or characteristic of the product.'" (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002))). For example, Charmander Media declined to use the Dash.fi Card "[f]or that reason." Johnson Decl. ¶¶ 69, 70, Ex. U.

Meta caused its statements to enter interstate commerce by communicating them electronically through its online platform and by email to advertisers and agencies across the country. Johnson Decl. ¶¶ 47, 49, 51 61, 62, 69, 70, Exhs. N, Q, U. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 n. 3 (9th Cir. 2011) ("A plaintiff bringing a false advertising claim must also show that defendant caused its false or misleading statement to enter interstate commerce … but this is virtually automatic for websites.")

While specific harm is not required for injunctive relief for false advertising (*Smart Inventions, Inc. v. Allied Commc'ns Corp.*, 94 F. Supp. 2d 1060, 1076 n.20 (C.D. Cal. 2000)), Dash.fi has been and will continue to be harmed. After Meta's statements, dozens of cardholders stopped using the Dash.fi Card, [redacted]—not to mention Dash.fi's monthly net revenue dropped [redacted] July 2026 to

Glaser Weil

present because of Meta's gamesmanship—and prospective customers including Charmander Media and Run Media walked away. Johnson Decl. ¶¶ 58-61, 69, 70, 81, 82, Exhs. U, P; *Clorox*, 398 F. Supp. 3d at 644–45 ("Lost sales for the plaintiff because of the defendant's false advertising is the paradigmatic direct injury from false advertising." (internal quotations and citations omitted)). Meta also diverted advertisers to its Line of Credit. Johnson Decl. ¶¶ 61, 62, Ex. Q. This is both direct sales diversion and a lessening of goodwill. *Southland Sod Farms*, 108 F.3d at 1139. Accordingly, Dash.fi is likely to succeed on its Lanham Act claim.

**2. <u>Meta Has Interfered with Dash.fi's Existing Contracts and Prospective Economic Relations.</u>**

The two interference torts share largely the same elements. Interference with contract requires "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). Interference with prospective economic relations protects the same interest but does not require a binding contract. *Id.*; *see CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007). It also requires conduct "wrongful by some measure beyond the fact of the interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). Dash.fi satisfies both standards.

Every Dash.fi cardholder is bound by the Dash.fi Cardholder Agreement and Ad Pay Protection Terms and Conditions, authorizing Dash.fi to manage payment cards and pursue refunds and chargebacks. Johnson Decl. ¶¶ 8-10, Exhs. D, E. Dash.fi also was in active discussions with Run Media and Charmander Media. Meta knew of these relationships given its notices to and comments made by its representatives regarding use of the Dash.fi Card to Dash.fi Card users and former card users, and its reference to chargebacks initiated by Dash.fi on behalf of cardholders and demand for

"all Dash.fi Card numbers associated with Meta advertiser accounts" in its cease-and-desist letter. Johnson Decl. ¶¶ 46-51, 54-56, 59, 60-66, 69, 70, 74-76, Exhs. M-R, U, W.

In addition, Meta's knowledge of Dash.fi's contract is properly inferred. Credit card use constitutes acceptance of the governing cardholder agreement—*i.e.*, each credit card account is governed by a binding contract. See *Du-Phillips v. Citibank, N.A.*, No. CV 25-00034 JAO-RT, 2025 WL 1615329, at *10 (D. Haw. June 5, 2025). By contacting advertisers who used Dash.fi cards, Meta reasonably knew those cardholders were operating under cardholder agreements.

Meta deliberately made these relationships difficult to maintain by declining charges, blocking BINs, re-billing charges to other cards, requiring Dash.fi cardholders to move from the Dash.fi Card to invoicing with "no exceptions," directing advertisers to "switch to Line of Credit," and cutting off Dash.fi's API access. Johnson Decl. ¶¶ 23-34, 37-42, 44-49, 51-57, 59-71, Exhs. G-U. As in *LinkedIn*, "implementation of technical measures selectively to ban" a third party, combined with legal threats, "could well constitute 'intentional acts designed to induce a breach or disruption'" of its contracts. *LinkedIn*, 31 F.4th at 1192. The disruption is concrete: monthly net revenue dropped [redacted] from July to August 2026. For example, Ruby Labs, Cubert.co, and True Classic pulled back or sought alternatives; and Run Media and Charmander Media walked away. Johnson Decl. ¶¶ 59-66, 69, 70, Exhs. P-S, U. Dash.fi's relationships "now hang[ ] in the balance," and it cannot deliver promised services. *LinkedIn*, 31 F.4th at 1192.

Meta spend on Dash.fi Cards is expected to fall to zero by October 5, 2026, and constitutes most of Dash.fi's business. Johnson Decl. ¶ 82. Dash.fi's claim is supported where "[w]ithout the revenue from sale of its products, [Dash.fi] will likely go out of business." *LinkedIn*, 31 F.4th at 1192.

For the prospective-relations claim, Dash.fi need only show that the acts "were unlawful for a reason other than that they interfered with [its] prospective economic advantage." *CRST Van Expedited*, 479 F.3d at 1110. Meta's conduct is unlawful because it violates the Lanham Act and UCL,

and Meta is suppressing Dash.fi's Ad Pay Protection product that helps advertisers recover fraudulent-click charges. Accordingly, Dash.fi is likely to succeed on both claims.

### 3. Meta's Conduct Violates California's Unfair Competition Law.

Meta's pretextual campaign to ban the Dash.fi Card violates California's Unfair Competition Law. Courts in this District recognize that UCL and Lanham Act claims are "substantially congruent." *Ingrid & Isabel, LLC v. Baby Be Mine, LLC*, 70 F. Supp. 3d 1105, 1119 (N.D. Cal. 2014); *Zeltiq Aesthetics, Inc. v. BTL Indus., Inc.*, 32 F. Supp. 3d 1088, 1099 (N.D. Cal. 2014). The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Meta's conduct satisfies all three prongs.

Conduct is "unfair" under the UCL if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *NJOY, LLC v. iMiracle (HK) Ltd.*, 760 F. Supp. 3d 1070, 1080 (S.D. Cal. 2024) (granting preliminary injunction). Meta's conduct fits that definition. By declining the Dash.fi Card, blocking its BINs, making false statements about Dash.fi and steering advertisers to Meta's credit line, blocking Dash.fi's API access, banning Dash.fi and its employees from Meta's platforms, and demanding that Dash.fi cease all activity on those platforms, Meta has engaged in conduct that the Ninth Circuit has recognized "may well be considered unfair competition under California law." *LinkedIn*, 31 F.4th at 1193–94. The Fourth Circuit reached the same result where a software platform cited security and system-performance reasons that were a cover for hurting a competitor. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 238 (4th Cir. 2025). Meta's "account integrity" and "suspicious payment method[s]" rationales are likewise a cover for its suppression of a competitor's Ad Pay Protection program and cardholder-authorized chargebacks.

Meta's conduct is also fraudulent. The fraudulent prong is satisfied where the public is "likely to be deceived." *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001). Meta told advertisers that the Dash.fi Card was a "Risk Payment – confirmed compromise" and a "suspicious payment method" from a "virtual bank" that failed Meta's verification checks. Johnson Decl. ¶¶ 47, 49, 51, 61, 62, Exhs. M, N, Q. Each statement was false—Dash.fi is not a bank, the card is issued by two traditional chartered banks, and the BINs were not compromised. Ruby Labs was deceived and concluded incorrectly based on Meta's statements that "other partners of Dash.fi run fraudulent business." Johnson Decl. ¶¶ 61, 62, Ex. Q.

The Court need not reach the unlawful prong, but Meta's conduct satisfies it as well. "Virtually any law—federal, state or local—can serve as a predicate" under the UCL. *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718 (2001). Meta's violations of the Lanham Act supply that predicate, as does Meta's tortious interference with Dash.fi's contracts and prospective economic relations. *See Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1090 (N.D. Cal. 2014) (granting injunctive relief).

Where a UCL violation threatens irreparable harm—as Meta's October 5, 2026 cutoff of every TransPecos Bank and Patriot Bank card does—courts grant early injunctive relief. *See NJOY*, 760 F. Supp. 3d at 1081. Accordingly, Dash.fi is likely to succeed on its UCL claim and this Court should grant its TRO on that basis alone. *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (granting TRO in part based on likelihood of success on UCL claim).

## B. DASH.FI HAS SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM

"The showing of irreparable harm is considered 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Kotok v. Homecomings Fin., LLC*, No. C09-662RSM, 2009 WL 1652151, at *2 (W.D. Wash. June 12, 2009) (quoting *Dominion Video Satellite, Inc. v. Echostar*



Glaser Weil

*Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)). Under 15 U.S.C. § 1116(a), a movant likely to succeed on a Lanham Act claim receives a rebuttable presumption of irreparable harm. Monetary injury alone generally is insufficient, but the threat of going out of business or damage to goodwill suffices. *See LinkedIn,* 31 F.4th at 1188; *Shippers, a Div. of Illinois Tool Works, Inc. v. Fontenot*, No. 13CV1349 JLS (MDD), at *6 (S.D. Cal. Sept. 23, 2013); *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

Dash.fi is entitled to the rebuttable presumption under 15 U.S.C. § 1116(a) because it is likely to succeed on its Lanham Act claim. Without an injunction, it will also suffer irreparable harm through imminent financial ruin and destruction of its reputation and goodwill caused by Meta.

**1. <u>Dash.fi Is Entitled to a Rebuttable Presumption of Irreparable Harm</u>**

Under 15 U.S.C. § 1116(a), Dash.fi is "entitled to a rebuttable presumption of irreparable harm … upon a finding of likelihood of success on the merits for a violation identified in [the Lanham Act] in the case of a motion for a preliminary injunction or temporary restraining order." *See also Baron App, Inc. v. OpenAI, Inc.*, 820 F. Supp. 3d 881, 908 (N.D. Cal. 2026); *OpenAI, Inc. v. Open A.I., Inc.*, 719 F. Supp. 3d 1033, 1049 (N.D. Cal. 2024), *aff'd*, No. 24-1963, 2024 WL 4763687 (9th Cir. Nov. 13, 2024). Because Dash.fi is likely to succeed on its Lanham Act claim, it is entitled to that presumption.

**2. <u>Meta Has Already Compromised Dash.fi's Reputation and Goodwill</u>**

The Ninth Circuit recognizes that "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm" because they are often unquantifiable and not fully remedied by money. *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 977 (9th Cir. 2026) (quoting *Rent-A-Ctr.*, 944 F.2d at 603). Threatened loss of prospective customers or goodwill also supports irreparable harm. *Stuhlbarg Int'l*, 240 F.3d at 841. Where a small, growing business is forced to suspend a major portion of its operations, those harms are difficult to value.

*Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 736 (N.D. Cal. 2020) (quoting *Stuhlbarg Int'l*, 240 F.3d at 841; *Rent-A-Ctr.*, 944 F.2d at 603). Thus, real loss of prospective customers and goodwill supports relief. *Novedades Y Servicios*, 181 F.4th at 979.

Dash.fi has already lost customers because of Meta's wrongful conduct and statements and faces loss of most remaining customers on October 5, 2026, when Meta will stop accepting the Dash.fi Card. Johnson Decl., ¶¶ 55, 56, 65, 66, 82, Exhs. O, S. Most Dash.fi revenue comes from Meta advertising charges. Johnson Decl., ¶ 78. Dash.fi currently has 234 active cardholders, 94 of whom were using the card for Meta advertising as of September 30, 2026. Johnson Decl., ¶ 80. [redacted]. Johnson Decl., ¶¶ 80, 81. [redacted]. Johnson Decl., ¶ 82.

In the past month, several users specifically stopped using the Dash.fi Card because of Meta's statements and conduct. Examples include:

- On September 3, 2026, Jon Santore of Run Media told Dash.fi it suspended plans to test the Dash.fi Card after a Meta representative said cards issued by TransPecos Bank or through Dash.fi "will no longer be supported for ads payments." Johnson Decl., ¶¶ 59, 60, Ex. P.
- On September 5, 2026, Roman Taranov of Ruby Labs said it would "remove all [Dash.fi] cards from [their] business accounts" due to "partners of Dash.fi run[ning] fraudulent business," after Meta repeatedly shut down Ruby Labs' account, called the Dash.fi Card a "suspicious payment method," and instructed Ruby Labs to "use [a] clean payment method or switch to Line of Credit[.]" Johnson Decl., ¶¶ 61, 62, Ex. Q.

Glaser Weil

- On September 8, 2026, Marius Ronnov of Cubert.co said Meta had shut down all advertising spending using the Dash.fi Card and named Dash.fi as the reason. He said "the risk is too great" using the Dash.fi Card on Meta and that, "[t]o avoid risk to [their] business," Cubert.co would prioritize non-Meta spend on Dash.fi. Johnson Decl., ¶¶ 63, 64, Ex. R.
- On September 11, 2026, after Meta representative Jeffrey Shih said that TransPecos Bank and Patriot Bank cards would no longer be accepted after October 5, Eric Martin of True Classic said that "[i]f there is no internal solution on [Dash.fi's] end," True Classic would "need to start researching alternatives [to the Dash.fi Card]." Johnson Decl., ¶¶ 65, 66, Ex. S.
- On September 12, 2026, Jessica Yen of Surfersjewelry.com said that "[her] Meta ads tanked because of the payment processing issue…" and as a result, she "[doesn't] know if [she'd] be on dash.fi again." Johnson Decl., ¶¶ 67, 68, Ex. T.

Damage to ongoing recruitment efforts and goodwill also qualifies as irreparable harm. *Rent-A-Ctr.,* 944 F.2d at 603. On September 23 and 24, 2026, Meta severely damaged Dash.fi's goodwill with employees by suspending the personal Meta accounts of six employees and contractors, and Meta unnecessarily addressed its cease-and-desist letter to those employees and contractors. *See* Johnson Decl., at ¶¶ 72-76, Exhs. V, W. Several employees thereafter refused to return to work, engaged in other insubordinate conduct, and incorrectly accused Dash.fi of wrongdoing based on Meta's false accusations in its letter. Johnson Decl., at ¶ 77.

Dash.fi has therefore suffered severe, unquantifiable goodwill damage from Meta's false and misleading statements and conduct. That damage will become catastrophic after October 5, 2026, if the relief sought is not granted and Meta blocks all use of the Dash.fi Card and continues its disparagement.

**3. Dash.fi Will Be Destroyed Absent Injunctive Relief**

"[S]howing a threat of [a business's] 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable." *LinkedIn*, 31 F.4th at 1188 (*citing Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)). In *LinkedIn*, the Ninth Circuit affirmed an injunction allowing the movant to continue accessing LinkedIn to gather public data it used for its services after LinkedIn blocked the movant's access and sent it a cease-and-desist letter. *LinkedIn,* 31 F.4th at 1184. The court held that forcing the movant to "fundamentally change the nature of its business" showed that its business could not survive without the data, and considered the lack of alternatives, contracts it could not honor, threatened financing, and employee departures in determining the movant had made a showing of irreparable harm. *Id.* at 1189.

[redacted]. Johnson Decl., ¶ 82. Although Dash.fi recently expanded services to include smaller advertising platforms and shipping costs, Meta ad spend remains the bulk of its business and it cannot survive without it. Johnson Decl., ¶ 78. Forcing Dash.fi to change its entire business to survive thus demonstrates the irreparable harm caused by Meta. *See LinkedIn*, 31 F.4th at 1189.

Without continued Meta card spend, Dash.fi risks insolvency and total destruction within two months or less. Johnson Decl., ¶ 83. To conserve funds, Dash.fi conducted a reduction in force on September 23, 2026, and plans another this month absent relief. *Id.* It also risks defaulting on financing arrangements with TransPecos Bank, which in that case could stop honoring Dash.fi Card charges. Johnson Decl., ¶ 84.

In addition, like the movant in *LinkedIn*, Dash.fi is in financing rounds with JPMorgan Chase Bank, N.A. and Dart Bank that are now jeopardized by its sudden revenue loss. *See LinkedIn*, 31 F.4th

at 1189; Johnson Decl., ¶ 85.

Unless an injunction restores Dash.fi's access to Meta's platforms and advertisers' ability to use the Dash.fi Card, the complete loss of Meta card spend will destroy Dash.fi in under two months. Johnson Decl., ¶ 83.

### 4. The Balance of Equities Tips Sharply in Dash.fi's Favor

The balance of equities requires considering "the interests of all parties and weigh[ing] the damage to each." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) (citation and internal quotation marks omitted). "[W]hen the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" *hiQ Labs*, 31 F.4th at 1188.

Meta has accused Dash.fi of a "systematic scheme designed to deprive Meta of rightfully earned revenue … to facilitate mass unauthorized chargebacks for advertising services delivered to Meta's commercial customers." Johnson Decl., at ¶¶ 74-76, Ex. W. Meta's conclusory and unsupported claim of fraudulent chargebacks ignores, and is likely an attempt to hide, its own systematic billing of fraudulent clicks and invalid traffic. Thus, Meta's true goal is to continue its own fraudulent scheme and avoid returning funds for ad costs it knows are fraudulent. Any losses from Dash.fi's chargebacks are minimal compared with Meta's advertising revenue. And there is a mechanism for Meta to dispute the chargebacks through Mastercard, but Meta has to date declined to do so in nearly every instance.

Dash.fi, by contrast, risks losing its entire business because Meta blocked access needed for the Ad Pay Protection auditing and card use on its platforms. Johnson Decl., ¶ 83. The balance of equities therefore tips sharply toward Dash.fi.

Glaser Weil

### C. THE PUBLIC INTEREST FAVORS AN INJUNCTION

The public interest strongly favors an injunction because Ad Pay Protection addresses a concrete consumer-fraud problem: Meta's billing of advertisers for fraudulent clicks and invalid traffic. *See F.T.C. v. Inc21.com Corp.*, 688 F. Supp. 2d 927, 940 (N.D. Cal. 2010) ("The public interest in preventing the continued and future fraudulent billing of unaware customers is undeniably great."). Between October 2025 and June 2026, Dash.fi identified that approximately 2.4% to 3.5% of charges incurred by Dash.fi Card users on Meta were derived from invalid traffic. Johnson, Decl., ¶ 14. Ad Pay Protection gives advertisers an independent mechanism to detect those charges, seek refunds, and, when Meta refuses or ignores a request, pursue a Mastercard chargeback. Johnson Decl., ¶¶ 7, 8, 12, 15. [redacted]. Johnson Decl., ¶ 21. [redacted]. *Id.* Those results are powerful evidence that Ad Pay Protection corrects fraudulent billing and protects advertisers, refuting Meta's improper characterization of the program as an allegedly unauthorized chargeback scheme.

Moreover, the injunction's impact reaches well beyond the parties. Ad Pay Protection serves over one hundred non-party advertisers, each of whom faces the loss of an independent check on charges that Meta itself controls, records, and bills. When an injunction's effects extend beyond the litigants and carry potential public consequences, the public interest is relevant, and the Court should weigh the likely consequences on the evidentiary record. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009). Here, the affected population is not incidental—it includes the advertisers who rely on Ad Pay Protection to identify invalid traffic and recover funds that should never have

Glaser Weil

been charged. The public interest therefore weighs heavily in Dash.fi's favor, because the requested relief protects consumers in a market where Meta's dominance leaves many advertisers with no practical alternative to its fraudulent billing practices.

**D. NO BOND SHOULD BE REQUIRED**

No bond should be required. Where an injunction will cause no realistic harm, a court may dispense with a bond. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Dash.fi seeks to restore the status quo so customers can use the Dash.fi Card on Meta's platforms as before. That will not meaningfully harm Meta, even if wrongfully enjoined, because its damages would be *de minimis*. *See Navigant Consulting, Inc. v. Milliman, Inc.*, No. C18-1154JLR, 2018 WL 3751983, at *4 (W.D. Wash. Aug. 8, 2018) ("There is minimal prejudice to Defendants because the TRO simply preserves the status quo ... [therefore] any potential costs and damages to Defendants are de minimis...")

## IV. CONCLUSION

For the foregoing reasons, Dash.fi respectfully requests that the Court **GRANT** its application for a temporary restraining order, requiring Meta to: (1) not ban the Dash.fi Card; (2) reverse its "technical enforcement measures" by not blocking Dash.fi's access to Meta's platform; (3) cease making false and misleading statements to Dash.fi's customers and the public; and (4) not block Dash.fi's, its employees' or its contractors' social-media pages.

DATED: October 6, 2026

GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP

By: ______________________
JEFF K. JOYNER
PETER M. BRANSTEN
GIANNA SEGRETTI
ROBERTO C. ARBULU

*Attorneys for Plaintiff*
*DASH.FI TECHNOLOGIES INC.*