SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

MOLLY JENNINGS (*pro hac vice*)
molly.jennings@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6443

*Attorneys for Defendant Meta Platforms, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

DASH.FI TECHNOLOGIES INC.,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 3:26-cv-11130-RFL

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Date: Thursday, October 15, 2026
Time: 10:00 a.m.
Place: Courtroom 4, 17th Floor

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1
BACKGROUND ........................................................................................................2
I. META'S ADVERTISING BUSINESS ........................................................................2
II. DASH.FI'S BUSINESS MODEL ............................................................................3
III. POLICIES GOVERNING DASH.FI'S RELATIONSHIP WITH META ..........................4
IV. META INVESTIGATES DASH.FI'S UNUSUAL CHARGEBACK ACTIVITY ............5
V. META TAKES ACTION ON INVESTIGATION FINDINGS AND DASH.FI SUES ........................................................................................................6
ARGUMENT ........................................................................................................7
I. DASH.FI HAS FAILED TO SHOW IMMINENT IRREPARABLE HARM ....................7
A. Dash.fi's Yearslong Delay In Seeking Relief Forecloses An Injunction ................8
B. Dash.fi Cannot Show Irreparable Harm from Business "Extinction" ....................9
C. Dash.fi Cannot Show Irreparable Harm from Damage to Reputation ..................11
D. Dash.fi Cannot Claim Irreparable Harm For Self-Inflicted Injuries ......................12
II. DASH.FI CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS .........13
A. Dash.fi's Lanham Act Claim Is Unlikely to Succeed ..........................................13
1. The Lanham Act Cannot Support The Requested Injunction ....................13
2. Meta's Statements Did Not Proximately Cause Dash.fi's Losses ............13
3. Meta's Messages Are Not "Commercial Advertising Or Promotion" ........................................................................................................14
B. Dash.fi's Tortious Interference Claims Are Unlikely to Succeed .........................16
1. Dash.fi Identifies No Independently Wrongful Act ..................................16
2. Meta Acted For Legitimate Business Purposes ........................................17
C. Dash.fi's UCL Claim Is Unlikely to Succeed .....................................................19
1. Meta's Refusal To Accept The Dash.fi Card Is Not "Unfair" ...................19
2. Dash.fi Identifies No Predicate Violation Of Law ....................................21
3. Dash.fi's "Fraudulent" Theory Is Its Lanham Act Claim Relabeled .........21
III. THE BALANCE OF EQUITIES WEIGHS AGAINST EXTRAORDINARY RELIEF ........................................................................................................22

IV. THERE IS NO PUBLIC INTEREST IN FORCING A COMPANY TO ACCEPT A PAYMENT METHOD ....22

V. THE REQUESTED RELIEF IS OVERBROAD AND NOT ADMINISTRABLE ....23

VI. ANY INJUNCTION SHOULD BE CONDITIONED ON A BOND ....24

VII. NO INJUNCTION SHOULD ISSUE WITHOUT EXPEDITED DISCOVERY ....25

CONCLUSION ....25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) ....................12

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ....................11

*Am. Trucking Ass'ns v. City of L.A.*,
559 F.3d 1046 (9th Cir. 2009) ....................7

*Ambassador Hotel Co. v. Wei-Chuan Inv.*,
189 F.3d 1017 (9th Cir. 1999) ....................14

*Apple, Inc. v. Samsung Elecs. Co.*,
877 F. Supp. 2d 838 (N.D. Cal. 2012), *rev'd on other grounds*,
695 F.3d 1370 (Fed. Cir. 2012)....................25

*Arenas v. Shed Media U.S. Inc.*,
881 F. Supp. 2d 1181 (C.D. Cal. 2011), *aff'd*, 462 F. App'x 709 (9th Cir. 2011) ....................12

*Ariix, LLC v. NutriSearch Corp.*,
985 F.3d 1107 (9th Cir. 2021) ....................16

*BiT Glob. Digit. Ltd. v. Coinbase Glob., Inc.*,
No. 3:24-cv-09019-AMO, Dkt. 32 (N.D. Cal. Dec. 18, 2024)....................1, 8, 19

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ....................23

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ....................19, 20, 21

*Cleary v. News Corp.*,
30 F.3d 1255 (9th Cir. 1994) ....................21

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
173 F.3d 725 (9th Cir. 1999) ....................14, 16

*Epic Games, Inc. v. Apple Inc.*,
2020 WL 5073937 (N.D. Cal. Aug. 24, 2020) ....................12

*Epic Games, Inc. v. Apple Inc.*,
493 F. Supp. 3d 817 (N.D. Cal. 2020)....................22

*Facebook, Inc. v. BrandTotal Ltd.*,
499 F. Supp. 3d 720 (N.D. Cal. 2020) .................... *passim*

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
314 F.3d 48 (2d Cir. 2002)....15, 16

*Fortyune v. Am. Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004)....23

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015)....13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022)....9, 10, 18, 20

*Ixchel Pharma, LLC v. Biogen, Inc.*,
9 Cal. 5th 1130 (2020)....16, 17, 18

*Jorgensen v. Cassiday*,
320 F.3d 906 (9th Cir. 2003)....24

*Koller v. Brown*,
224 F. Supp. 3d 871 (N.D. Cal. 2016)....7

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003)....17

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011)....21

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
634 F.2d 1197 (9th Cir. 1980)....9, 11

*Lag Shot LLC v. Facebook, Inc.*,
545 F. Supp. 3d 770 (N.D. Cal. 2021)....10

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
941 F.2d 970 (9th Cir. 1991)....13

*Levitt v. Yelp! Inc.*,
765 F.3d 1123 (9th Cir. 2014)....20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....13

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
16 F.3d 1032 (9th Cir. 1994)....25

*NJOY, LLC v. iMiracle (HK) Ltd.*,
760 F. Supp. 3d 1070 (S.D. Cal. 2024)....19

*Nutrition Distrib. LLC v. Lecheek Nutrition, Inc.*,
2015 WL 12659907 (C.D. Cal. June 5, 2015)....11

*Oakland Trib., Inc. v. Chronicle Publ'g Co.*,
762 F.2d 1374 (9th Cir. 1985) ....... 8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) ....... 1

*People's Choice Wireless, Inc. v. Verizon Wireless*,
131 Cal. App. 4th 656 (2005) ....... 19

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
413 U.S. 376 (1973) ....... 24

*Prager Univ. v. Google LLC*,
951 F.3d 991 (9th Cir. 2020) ....... 15, 16

*Protech Diamond Tools, Inc. v. Liao*,
2009 WL 1626587 (N.D. Cal. June 8, 2009) ....... 8

*Quelimane Co. v. Stewart Title Guar. Co.*,
19 Cal. 4th 26 (1998) ....... 17, 18

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
131 F.4th 205 (4th Cir. 2025) ....... 20

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991) ....... 11

*Republican Nat'l Comm. v. Google LLC*,
742 F. Supp. 3d 1099 (E.D. Cal. 2024) ....... 17

*Richardson v. La Rancherita*,
98 Cal. App. 3d 73 (1979) ....... 18

*Royalty Ambulance Servs. v. HHS*,
2014 U.S. Dist. LEXIS 64000 (C.D. Cal. May 8, 2014) ....... 8

*Shroyer v. New Cingular Wireless Servs., Inc.*,
622 F.3d 1035 (9th Cir. 2010) ....... 21

*Smart Inventions, Inc. v. Allied Commc'ns Corp.*,
94 F. Supp. 2d 1060 (C.D. Cal. 2000) ....... 13

*Sovereign Natchez Nation v. Riverside Cnty. Dep't of Soc. Servs. Child. Protective Servs.*,
2022 WL 19865440 (C.D. Cal. Mar. 10, 2022) ....... 8

*Stackla, Inc. v. Facebook Inc.*,
2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ....... 1, 2, 10, 22, 23

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ....................22

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ....................11

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)....................24

*Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................7

*Xport Forwarding LLC v. Mesitis DWC LLC*,
694 F. Supp. 3d 1258 (C.D. Cal. 2023) ....................11, 12

**STATUTES**

15 U.S.C. § 1116(a) ....................13

15 U.S.C. § 1125(a)(1)(B) ....................14

**RULES**

Fed. R. Civ. P. 65....................23, 24

## INTRODUCTION[1]

Dash.fi seeks the extraordinary relief of a mandatory injunction requiring Meta to do business with Dash.fi notwithstanding Dash.fi's history of abusing payment network systems, systematically violating Meta's policies, and deliberately evading Meta's enforcement efforts. But no company has an unconditional right to do business with any other; rather, "as a general rule, businesses are free to choose the parties with whom they will deal." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Like any merchant, Meta decides which forms of payment to accept. And like any platform, Meta sets and enforces the terms, policies, and standards that govern use of and access to its platform. Courts in this district have, time and again, rejected claims requiring platforms to resume doing business with companies they determined violated their rules. *See, e.g.*, *BiT Glob. Digit. Ltd. v. Coinbase Glob., Inc.*, No. 3:24-cv-09019-AMO, Dkt. 32 at 35-37 (N.D. Cal. Dec. 18, 2024); *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288 (N.D. Cal. Sept. 27, 2019); *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720 (N.D. Cal. 2020).

Dash.fi offers no reason for this Court to insert itself into Meta's and Dash.fi's business dealings. It cannot satisfy a single preliminary-injunction factor, let alone all four.

Start with irreparable injury—the foundational harm a preliminary injunction is supposed to prevent. Even though Dash.fi claims Meta has been targeting it for nearly ***two years***, Dash.fi never sought relief or even filed litigation until now—after Meta called out its abuses. And although Dash.fi has known since September 11 that Meta planned to stop accepting certain Dash.fi credit cards beginning October 5—a "date-certain extinction event" for its business, according to Dash.fi, Mot. 1—Dash.fi did not bother filing this motion before that "extinction event" and waited ***25 days*** to act. Dash.fi's arguments now that it urgently needs emergency relief or else it faces imminent extinction and reputational losses are not credible. Its position is also prejudicial to Meta. Dash.fi demands sweeping relief without first giving Meta a chance to test

[1] Dash.fi styled its motion as an *ex parte* motion for a temporary restraining order and an order to show cause why a preliminary injunction should not issue. Dkt. 14. The Court has directed that the motion be treated as one for a preliminary injunction and set an expedited schedule, Dkt. 20, and Meta responds on that basis. Given that schedule and the emergency relief Dash.fi seeks, Meta is opposing the motion now. In doing so, Meta does not waive, and expressly reserves, any right to move to compel arbitration of Dash.fi's claims.

Dash.fi's claims through discovery. But even on the slanted record Dash.fi curates for this motion, it is clear that its arguments do not hold water.

Dash.fi's claims are not likely to succeed on the merits. Its Lanham Act claim cannot support the card-and-account relief it principally seeks, and the challenged statements neither caused Dash.fi's losses nor constituted commercial advertising or promotion. Its interference claims fail because Dash.fi's customer relationships are at will, Meta committed no independently wrongful act, and Meta acted to protect legitimate business interests. And the UCL does not require a merchant to accept a payment method or restore platform access where no law was violated and competition was not harmed.

Dash.fi fares no better on the remaining preliminary-injunction factors. The balance of equities does not justify upsetting Meta's ordinary course decision to stop doing business with Dash.fi—particularly not when Dash.fi's business relies on abusing Meta's policies. And there is no legitimate public interest in Dash.fi continuing its business model. The public interest cannot rest on assuming the misconduct a plaintiff alleges; before adjudication, an "appeal to the public interest of enjoining statutory violations begs the question." *Stackla*, 2019 WL 4738288, at *6. This is particularly true because "[Meta's] ability to decisively police the integrity of its platforms is without question a pressing public interest," *Id*.

Even if Dash.fi could satisfy the demanding standards required for a mandatory injunction (it cannot), the proposed injunction Dash.fi seeks is riddled with problems. It is overbroad, not administrable, and would operate as a prior restraint on Meta's speech, among other legal faults. Finally, to the extent the Court orders any injunctive relief (and to be clear, it should not), it should, at the very least, require Dash.fi to post a bond and stay the order to allow Meta to appeal.

## BACKGROUND

### I. META'S ADVERTISING BUSINESS

Meta operates Facebook, Instagram, and other services that connect billions of users around the globe. Meta earns revenue by selling advertising. Larsen Decl. ¶ 3. As a merchant, Meta decides which payment methods it will accept for that advertising. *Id.* ¶¶ 5, 20. And as a platform, Meta sets and enforces terms on which others may use its services. Jablonicky Decl. Exs. 1–5.

Advertisers manage their campaigns through Meta's self-service tools, and may pay Meta by card, PayPal, direct debit, or monthly invoice. Larsen Decl. ¶ 4. Meta does not issue its own cards or sell ad-auditing services. *Id.* ¶¶ 4, 29. Meta generally delivers the ads first and charges later, so any disputed charge reverses payment for already-delivered advertising. *Id.* ¶¶ 6, 15.

Meta bills advertisers based on ad traffic metrics that "[Meta's] tracking mechanisms" monitor. Jablonicky Decl. Ex. 2 (Self-Serve Ad Terms). Meta does not guarantee particular ad reach or bear responsibility for invalid click activity. *Id*. Meta's terms instruct that an advertiser that believes "an unauthorized or otherwise problematic transaction has taken place under [their] account" should "notify [Meta] immediately." *Id.* Ex. 3 (Community Payment Terms). Meta reviews refund requests and, where warranted, refunds the original payment method without involving the card network or issuing bank. Larsen Decl. ¶ 8.

## II. DASH.FI'S BUSINESS MODEL

Dash.fi is a fintech company that offers various products and an enterprise platform to help businesses manage payments. Jennings Decl. Ex. 1. One product Dash.fi offers is a Mastercard-branded card issued by TransPecos Bank or Patriot Bank. Johnson Decl. ¶¶ 2-3.[2] The credit card comes with a perk: "Ad Pay Protection," which promises users who spend more than $100,000 monthly on Meta or Google advertising up to 3% back on ad spend. Johnson Decl. Ex. E, § 4.2.

Per Dash.fi, the program is funded by requests "to the supported advertising networks (e.g., Google, Meta) on your behalf to recover overcharges, invalid traffic, or other billing errors." *id.* Ex. E, §§ 3.1.b, 4.2, 6.1. Dash.fi claims this will be done "under the ad platform's internal policies and timelines" and does not mention pursuing card network chargebacks in its cardmembers' names. *Id.* § 4.2.

In reality, because Meta's policies do not provide for refunds solely on the basis of "auditor" claims, Dash.fi pursues aggressive chargeback requests on behalf of cardholders through the Mastercard network, sending requests to the card-issuing banks to reverse transactions on which it wants a refund. Johnson Decl. ¶ 18; Larsen Decl. ¶ 29. Dash.fi is incentivized to submit

[2] Unless noted, emphasis has been added and internal citations and quotations omitted. "Johnson Decl." refers to Dkt. 13-5. "Mot." refers to Dash.fi's Memo in support of its Motion at Dkt. 13-6. "Johnson Decl. Ex." citations refer to Dkts. 14-4 through 14-26.

large volumes of chargeback requests, whether valid or not, because its revenue is tied to volume. Dash.fi derives revenue from chargeback amounts it obtains above 3% of an advertiser's monthly spend. Johnson Decl. Ex. E, §§ 6.1, 7.1(b). Because an advertiser must have at least $100,000 of monthly ad spend to participate in the program, *id.* § 3.1b, amounts Dash.fi keeps can be substantial.

Pursuing refunds through chargeback requests rather than Meta's own processes allows Dash.fi to exploit the challenging realities merchants face defending chargeback requests at scale. Contesting a dispute past the first stage of a chargeback request is costly. [redacted] Larsen Decl. ¶¶ 10–12; *see also* Jennings Decl. Ex. 2 at 4 (Mastercard guidance that chargeback "costs often exceed the total value of the item being disputed"). Dash.fi's [redacted] Johnson Decl. ¶ 21, reflects Dash.fi's persistence pursuing these requests—not their merit.

[redacted] Johnson Decl. ¶ 21. That volume is extraordinary. As discussed below, Dash.fi's unusual activity triggered a Meta investigation in 2026 that revealed a substantial portion of Dash.fi's chargebacks were illegitimate and violated Meta's terms and policies.

## III. POLICIES GOVERNING DASH.FI'S RELATIONSHIP WITH META

To operate the Ad Pay Protection program on Meta ad transactions, Dash.fi accesses Meta's platform, uses its payment systems, and collects data from cardholders' Meta ad accounts through the Meta API. Johnson Decl. ¶¶ 16, 45. Thus, Dash.fi is required to comply with Meta policies. Relevant policies and terms include:

- **Meta Terms of Service**: prohibit using Meta products for anything "misleading … or fraudulent" or to "facilitate or support others in doing so." Jablonicky Decl. Ex. 1 (Terms of Service). The terms also prohibit misusing any "dispute … channel" through "fraudulent, duplicative, or groundless" claims. *Id.*
- **Meta Advertising Standards:** incorporate and apply the Community Standard on Account Integrity (CSAI) to "[b]usiness assets" including Dash.fi's business account. The CSAI allows Meta to "restrict or disable" business accounts "used to evade [Meta's] enforcement actions or review processes," including where those accounts show "[c]lose linkage with a network of accounts or other entities that violate or evade [Meta's] policies." *Id.* Ex. 4 (Advertising Standards), Ex. 5 (Account Integrity).

- **Meta Community Payment Terms**: govern Dash.fi's cardholders and provide Meta may "add or remove permitted payment methods (e.g., credit cards)" and, "[i]n order to prevent financial loss," may "limit or disable payment instruments." *Id.* Ex. 3 (Community Payment Terms).

## IV. META INVESTIGATES DASH.FI'S UNUSUAL CHARGEBACK ACTIVITY

In June 2026, a spike in chargeback activity led Meta to open an internal investigation. Larsen Decl. ¶ 21. That investigation traced most of the chargebacks in the spike to TransPecos-issued cards, and in turn, to Dash.fi, [redacted] *Id.* ¶¶ 22, 26.

That investigation found extraordinary and improper activity from the cards. The findings included that, over a recent 60-day period, cards issued by TransPecos accounted for [redacted] of Meta's ad-spend revenue, yet represented approximately [redacted] of Meta's chargeback amounts across all issuing banks. Zadik Decl. ¶ 9. Chargebacks on the cards totaled approximately [redacted] of total ad-spend on the cards, compared to just [redacted] of ad spend on all other cards. *Id.* Thus, for every dollar of ad spend, chargebacks on TransPecos cards occurred at a rate roughly [redacted] **times** higher than on all other cards. *Id.*

Meta's investigation also revealed Dash.fi's chargeback requests were not typical chargeback requests. Typically, the chargeback process allows a card-issuing bank to reverse a completed payment after a cardholder disputes the validity of the charge. Larsen Decl. ¶ 9. So that the merchant is informed about the reason for the dispute and how it can respond, card network rules require a party requesting a chargeback to submit "reason codes." Jennings Decl. Ex. 3 at 7.

Meta discovered TransPecos-linked Dash.fi credit cards had a pattern of misapplying chargeback codes. The chargebacks used fraud-related reason codes (e.g., reason code 4837 – "No Cardholder Authorization"), despite having no evidence of unauthorized charges. Zadik Decl. ¶¶ 14–15; Johnson Decl. ¶¶ 12-15 (nature of disputed charges). MasterCard's chargeback rules do not allow fraud chargebacks for disputes about the quality of goods or services. Jennings Decl. Ex. 3 at 7 (listing fraud-related disputes as distinct from disputes where "[g]oods or services were either: not as described, defective, or not provided"); Jennings Decl. Ex. 4 at 5-9 (permissible conditions for fraud chargebacks). Further, after reporting fraud-related reason codes, a card issuer

typically cancels a card to prevent additional fraud or unauthorized use of the card. Larsen Decl. ¶ 9. [redacted]. *Id.* ¶ 23; Zadik Decl. ¶ 17.

Meta's investigation also revealed Dash.fi's users may have been unaware that Dash.fi was submitting chargebacks on their behalf. Larsen Decl. ¶¶ 30–31. An internal report of a conversation with an advertiser stated that [redacted]. *Id.* ¶ 30. Another advertiser's CEO wrote to Meta: [redacted] *Id.* ¶ 31.

Meta also discovered that Dash.fi was attempting to avoid detection by automated Meta systems that flag unusual transaction activity. [redacted] Larsen Decl. ¶¶ 15–17. They often blocked spend from Dash.fi cards "[w]ithin days or weeks of a chargeback dispute being initiated." Johnson Decl. ¶ 22. Meta's investigation uncovered that, [redacted]. Zadik Decl. ¶ 21. To accomplish this, Dash.fi created "thousands of virtual cards" across its "pool of shared Mastercard BIN ranges." Johnson Decl. Ex. R.

Dash.fi's conduct violated multiple Meta policies, including the Terms of Service, which prohibit misleading or fraudulent conduct, as well as misuse of dispute channels, and Meta's Advertising Standards, which prohibit conduct intended to circumvent or avoid Meta's enforcement or review processes. Jablonicky Decl. Exs. 1–5.

## V. META TAKES ACTION ON INVESTIGATION FINDINGS AND DASH.FI SUES

Meta responded to the Dash.fi investigation findings in stages. [redacted]. Zadik Decl. ¶ 23.

[redacted]. *Id.* ¶ 24. [redacted]

[redacted]. *Id.*

On September 11, 2026, Meta notified affected advertisers that, starting October 5, 2026, "cards issued by TransPecos Bank and Patriot Bank [will] no longer be accepted" as a payment method for ads. Johnson Decl. ¶ 55; Johnson Decl. Ex. O, at 2; Ex. S, at 3. ([redacted]. Larsen Decl. ¶ 27.). Dash.fi again evaded Meta's changes. For example, Dash.fi recommended its customers route Dash.fi Card payments through PayPal, and launched "new Mastercard BIN ranges." Johnson Decl. Ex. R, at 2, 9; Ex. P, at 8. Meta is still evaluating how to implement this policy to address chargeback abuse from Dash.fi while minimizing inconvenience to advertisers. *See* Larsen Decl. ¶ 39.

On September 23, 2026, Meta restricted Dash.fi's business account and API access and disabled the accounts of key Dash.fi employees and affiliates involved in Dash.fi's chargeback scheme. Johnson Decl. ¶¶ 71–73; Johnson Decl. Ex. V, at 2; Jablonicky Decl. Exs. 4–5. The next day, Meta's outside counsel sent Dash.fi a cease-and-desist letter explaining that it had gathered evidence that Dash.fi "operates a systematic scheme designed to deprive Meta of rightfully earned revenue," and demanding that Dash.fi stop. Johnson Decl. Ex. W, at 2. In response, Dash.fi filed this lawsuit on September 29, 2026.

## ARGUMENT

To obtain a preliminary injunction, Dash.fi must show that it: "(1) [is] likely to succeed on the merits; (2) [is] likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in [its] favor; and (4) an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All four requirements point decisively against a preliminary injunction for Dash.fi.

## I. DASH.FI HAS FAILED TO SHOW IMMINENT IRREPARABLE HARM

"[T]he 'single most important prerequisite for the issuance of'" a preliminary injunction is irreparable harm. *Koller v. Brown*, 224 F. Supp. 3d 871, 879 (N.D. Cal. 2016). The standard is demanding: "[A]n injunction cannot issue merely because it is possible that there will be an irreparable injury to the plaintiff; it must be likely that there will be." *Am. Trucking Ass'ns v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). Dash.fi falls far short.

### A. Dash.fi's Yearslong Delay In Seeking Relief Forecloses An Injunction

Even though Dash.fi claims Meta has been waging a "retaliatory campaign" against it for almost ***two years***, Compl. ¶ 5, Dash.fi never sought relief or filed litigation until now—and only after Meta called out its abuses. A delay in seeking relief, "standing alone, constitutes grounds for rejecting" a preliminary injunction, *Protech Diamond Tools, Inc. v. Liao*, 2009 WL 1626587, at *6 (N.D. Cal. June 8, 2009), because the delay "implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

Dash.fi's failure to seek relief over the last two years undermines its claim of imminent irreparable harm. The Complaint alleges, "[s]ince ***early 2025***, Meta has targeted Dash.fi" with the so-called "Dash.fi Ban:" rejecting Dash.fi card payments, notifying Dash.fi customers that their cards are risky, and driving down Dash.fi revenue. Compl. ¶ 5. This is the alleged conduct that Dash.fi now seeks to enjoin. Mot. 25. It is not credible that Dash.fi requires an emergency ruling on these issues within days when it has not bothered to take any legal action for years.

Nor do recent events—Meta's September 11, 2026 announcement it would stop accepting TransPecos-issued cards starting October 5, 2026, Mot. 11 & Compl. ¶ 47—justify Dash.fi's delay. Dash.fi still waited ***25 days*** before seeking a TRO, and did not do so until *after* the planned "date-certain extinction event" on October 5 that would lead to Dash.fi's "extinction" within weeks. Mot. 1, 22-23. Where, as here, "[t]here is no indication that Plaintiff was unable to make this emergency request sooner; and Plaintiff provides no explanation for why it waited until the eleventh hour to file," a preliminary injunction is unwarranted. *Sovereign Natchez Nation v. Riverside Cnty. Dep't of Soc. Servs. Child. Protective Servs.*, 2022 WL 19865440, at *1 (C.D. Cal. Mar. 10, 2022).

Courts routinely deny emergency relief for less egregious delays. *E.g.*, *Royalty Ambulance Servs. v. HHS*, 2014 U.S. Dist. LEXIS 64000, at *8-9 (C.D. Cal. May 8, 2014) (ten-day delay "negates" irreparable harm). *BiT Global* is instructive. There, Coinbase gave a month's notice it would delist plaintiff's token, yet plaintiff waited until the eve of the delisting—four days before—to file for emergency relief. Dkt. 25 at 16; Dkt. 32 at 3, 35. The court ruled that plaintiff's delay "undermines the needed showing" of imminent irreparable harm. Dkt. 32 at 36. Dash.fi's lack of diligence is worse because it did not seek relief before the claimed "date-certain extinction event."

Although Dash.fi argues Meta's "campaign did not become clear" until September 23, this argument is neither credible nor material. Mot. 1. The Complaint details a long chronology of Meta's purported injurious conduct, dating back to 2025 and well before September 23, about which Dash.fi knew. Compl. ¶¶ 18-53. Dash.fi's failure to move for weeks after September 23, and not before the "extinction event," undercuts its claimed belief of imminent extinction.

Dash.fi's request for a broad preliminary injunction based on a manufactured emergency is prejudicial to Meta. Rather than permit Meta to undertake discovery to test Dash.fi's self-serving claims of imminent irreparable harm and to develop issues for the Court to consider in an orderly way, Dash.fi is demanding the Court enter a rush order based on its say-so.[3] Its unjustified delay reveals why this say-so should not be credited.

**B. Dash.fi Cannot Show Irreparable Harm from Business "Extinction"**

Because "monetary injury [from revenue loss] is not normally considered irreparable," *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980), Dash.fi argues instead it faces an imminent "threat of 'extinction.'" *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022). Dash.fi does not clear this bar.

Dash.fi attempts to frame its arguments to track the business-extinction factors that the *hiQ Labs* Court credited, but even its selective record on this motion falls short. Dash.fi relies primarily on its CEO's conclusory statement that "the complete loss of Meta card spend will destroy Dash.fi in under two months." Mot. 23. Dash.fi attempts to back up its grim prognosis by claiming: (1) Dash.fi is wholly dependent on its Meta revenue stream, (2) Meta is "[f]orcing Dash.fi to change its entire business," and (3) Meta's actions have cost Dash.fi significant revenue, forced layoffs, and undermined its capital raises. Mot. 23-24. Even before discovery, these assertions fail to show its imminent extinction.

First, contrary to Dash.fi's claim now that it is a business narrowly focused on payment solutions for Meta ad spend, outside of litigation, Dash.fi holds itself out as a diversified fintech. Dash.fi's public materials boast it has five different product lines and sells an enterprise platform.

[3] If the Court is considering granting relief to Dash.fi, Meta requests the Court first enter an expedited discovery schedule.

Jennings Decl. Ex. 1. The Dash.fi credit card is a general-purpose, not Meta-specific, credit card. As Dash.fi's evidence shows, its customers use the Dash.fi credit card with merchants well beyond Meta. *E.g.*, Johnson Decl. ¶ 80 [redacted] & Ex. R (customer notifying Dash.fi, "[w]e have been instructed that dash.fi cards can no longer be used on meta's platform. To avoid risk to our business, ***we will prioritize non meta spend on Dash***, and leave it at that. This also fits better with our credit limit and setup with you guys"). Even as to the program here, Dash.fi offers it for ***Google*** ad spend. Jennings Decl. Ex. 1; Compl. ¶ 18 (discussing Dash.fi business with "Meta's competitor Google"). The motion also acknowledges Dash.fi's revenue streams beyond Meta. Mot. 22 (conceding Dash.fi business has "expanded [into other] advertising platforms and shipping costs" products).

It is precisely because Dash.fi's business has not been shown to be dependent on Meta that this case is not on "all fours" with *hiQ*. Mot. 2. In concluding an internet business had shown its likely extinction after LinkedIn cut off its access, the *hiQ* Court relied significantly on the fact that the party had demonstrated, through "ample support," that it was LinkedIn-centric and LinkedIn-dependent. *See hiQ*, 31 F.4th at 1189. The company's sole product was to provide *LinkedIn* data analytics to employers. LinkedIn's actions forced the business to fundamentally change its identity. That is not the case here: outside of its untested, litigation-driven assertions, Dash.fi has made clear it is not a Meta-centric or Meta-dependent business.

Dash.fi's claims that Meta's actions have caused a domino effect of lost revenue, employee layoffs, and challenges raising capital also fail to show imminent business extinction. Dash.fi has not, for example, submitted a single financial document as evidence of actual revenue streams at risk if an injunction is denied. Nor has Dash.fi submitted projections showing the revenue it necessarily will lose in the future, even as Dash.fi is continuing to pursue numerous revenue streams and strategies. In the absence of corroborating evidence, all Dash.fi can rely on is the conclusory statements of its executive, which is categorically insufficient. *See Lag Shot LLC v. Facebook, Inc.*, 545 F. Supp. 3d 770, 787 (N.D. Cal. 2021) (plaintiff did not show "threat of being driven out of business" based on its executive's "mere assertions" that it would "likely go out of business" due to Facebook's conduct); *Stackla,* 2019 WL 4738288, at *5 ("This court cannot hinge

a finding that [company] faces the threat of being driven out of business, caused by conduct likely to occur prior to a preliminary injunction hearing, based on its CEO's estimate that the company will 'soon reach a tipping point.'"); *Am. Passage*, 750 F.2d at 1474 (reversing injunction due to "insufficient evidence that [business] is threatened with extinction" where plaintiff relied on executive's *ipse dixit* that it "sustained large losses in 1982-83, and . . . forecast large losses again in 1983-84"). In reality, Dash.fi is claiming nothing more than revenue losses associated with Meta ad spending, but such losses are a classic injury redressable through damages, and not "irreparable." *L.A. Mem'l Coliseum*, 634 F.2d at 1202.

**C. Dash.fi Cannot Show Irreparable Harm from Damage to Reputation**

Dash.fi's argument that it faces irreparable harm from damage to reputation and loss of goodwill fares no better. Where a claimed reputational injury "could be remedied by monetary damages," it does not rise to an "irreparable harm." *Nutrition Distrib. LLC v. Lecheek Nutrition, Inc*., 2015 WL 12659907, at *7 (C.D. Cal. June 5, 2015). It is incumbent on the party to "explain" why that harm "cannot be adequately addressed by a monetary award." *Xport Forwarding LLC v. Mesitis DWC LLC*, 694 F. Supp. 3d 1258, 1270 (C.D. Cal. 2023).

Dash.fi has not done so. To the contrary, its own briefing lays bare that what it claims is reputational harm is a repackaged lost-revenue argument. Dash.fi argues, [redacted] Mot. 20. Because Dash.fi can quantify the impact of these losses, there is no reason why damages would not redress its harm. Dash.fi's contrary citations are inapposite. *E.g.*, *BrandTotal Ltd*., 499 F. Supp. at 736 (noting courts will *not* recognize goodwill harm where "value [can] be placed on" it, but finding losses here were "difficult to valuate" under facts); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 841 (9th Cir. 2001) (irreparable harm based on lost trademark value).

Nor does Dash.fi's claimed harm to "recruitment efforts" suffice. Mot. 19, 21. Dash.fi relies on *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991), but that case involved a defendant's systematic recruitment of plaintiff's employees in violation of a non-compete. *Id.* at 599-600, 603. Here, by contrast, there is no direct evidence of

adverse impact on recruitment. Dash.fi points only to isolated examples of employees expressing discontent or stopping working after the Meta cease-and-desist letter. Johnson Decl. ¶ 77. Dash.fi has failed to explain how these examples amount to "irreparable" harm as opposed to run-of-the-mill workplace-relations issues resulting from exposure of Dash.fi's scheme. In any case, any claimed reputational injury was Dash.fi's own doing and not irreparable harm. *Infra* § I.D.

### D. Dash.fi Cannot Claim Irreparable Harm For Self-Inflicted Injuries

Dash.fi's claim of irreparable harm fails for another fundamental reason: its purported injuries—whether business extinction or reputational harm—are self-inflicted. "Self-inflicted wounds are not irreparable injury," *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020). Dash.fi's business model is the fundamental reason it is in its present position, so it faces a "predicament" "of its own making," *Epic Games, Inc. v. Apple Inc.*, 2020 WL 5073937, at *3 (N.D. Cal. Aug. 24, 2020). If it is in fact true that Dash.fi cannot survive without running its scheme on Meta, that is a consequence of Dash.fi's own strategic decision to build its business this way. Meta was always free to "add or remove permitted payment methods" and Dash.fi assumed that commercial risk. Jablonicky Decl. Ex. 3; *see BrandTotal Ltd.*, 499 F. Supp. 3d at 736 (finding no irreparable harm where purported losses were potentially due to a company's own "business judgment" on where to allocate its "available funds," thereby reflecting "merely a [strategic] choice" the company made, as opposed to harm caused by Facebook).

Furthermore, Dash.fi especially cannot claim irreparable harm here, where it chose to predicate one of its lines of business on *wrongdoing*. Meta acted within its rights as a merchant and platform in suspending Dash.fi after discovering its persistent abuses. Because the alleged adverse impact "was the result of [Dash.fi's] own failure[s]," it cannot claim "irreparable harm." *Xport*, 694 F. Supp. 3d at 1271 (no irreparable harm where plaintiff had breached contract, failed to timely pay, and then attempted to argue counterparty's enforcement efforts damaged it); *see Arenas v. Shed Media U.S. Inc.*, 881 F. Supp. 2d 1181, 1194 (C.D. Cal. 2011), *aff'd*, 462 F. App'x 709 (9th Cir. 2011) (no irreparable harm where plaintiff's "publicized behavior" inflicted injury).

## II. DASH.FI CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS

Because Dash.fi seeks a mandatory injunction, its burden is "doubly demanding": it must "establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). It cannot do so.

### A. Dash.fi's Lanham Act Claim Is Unlikely to Succeed

Dash.fi invokes the Lanham Act to claim a statutory presumption of irreparable harm. Mot. 19. But the Act cannot support the relief Dash.fi seeks, and the claim is unlikely to succeed.

#### 1. The Lanham Act Cannot Support The Requested Injunction

The Lanham Act authorizes injunctions only "to prevent a violation" of Section 1125. 15 U.S.C. § 1116(a). Dash.fi alleges that Meta violated the Act through statements to certain customers. Mot. 11-13. But most of Dash.fi's proposed order would require Meta to accept Dash.fi's card and restore accounts, API access, and account data. Dkt. 14-2, ¶¶ 1-4, 7-9, 11. That would not prevent any allegedly false statement. Because injunctive relief "must be tailored to remedy the specific harm alleged," *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991), this "mismatch" between Dash.fi's claim and the harm it seeks to remedy defeats its request. *Garcia*, 786 F.3d at 744. The Act therefore supplies neither a basis for the non-speech relief Dash.fi seeks nor a presumption of irreparable harm as to that relief. Those requests rise or fall with Dash.fi's state-law claims. *See infra* §§ II.B–C.

#### 2. Meta's Statements Did Not Proximately Cause Dash.fi's Losses

A Lanham Act plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising," which "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Dash.fi never addresses that requirement. Instead, it relies on a pre-*Lexmark* district-court decision stating, "specific harm is not required for injunctive relief." Mot. 14 (citing *Smart Inventions, Inc. v. Allied Commc'ns Corp.*, 94 F. Supp. 2d 1060, 1076 n.20 (C.D. Cal. 2000)). But to obtain relief, Dash.fi must show "injury proximately caused by [Meta's] alleged misrepresentations." *Lexmark*, 572 U.S. at 140. It cannot.

Dash.fi's own evidence places most of its losses before the first challenged statement, and

"events which occur after the injury has occurred cannot be said to have caused the injury." *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1029 (9th Cir. 1999). By Dash.fi's own account, Meta had been blocking Dash.fi's BINs since at least July 2025, and spend on a card "would stop" "[w]ithin days or weeks of a chargeback dispute being initiated." Johnson Decl. ¶¶ 22, 27. By July 31, 2026 (two weeks before the first challenged statement on August 14), more than [redacted] of the [redacted]" in monthly Meta spend that Dash.fi claims its customers have removed from the card was already gone. *Id.* ¶¶ 43, 47, 79. The later losses likewise track Meta's conduct, not its statements: by August 20, Meta "had stopped accepting the Dash.fi Card across multiple advertiser accounts"; by August 28, it "had blocked every existing BIN"; and on September 11, it notified users that the card would not be accepted after October 5. Johnson Decl. ¶¶ 52-53, 55. Dash.fi accordingly expected [redacted]. *Id.* ¶ 82.

Dash.fi's customer evidence confirms advertisers reacted to Meta's enforcement in response to Dash.fi's conduct, not to any alleged deception. Dash.fi does not claim H.D. Retail or Larine, the recipients of the "confirmed compromise" and "virtual bank" messages, stopped using its card at all. *See* Johnson Decl. ¶¶ 47-51, 58-70; Mot. 14-15. Instead, Dash.fi gave H.D. Retail two more cards, Johnson Decl. Ex. M at 3, and Larine blamed "declines from Dash on several platforms," Ex. N at 2. Other customers pulled back due to declined payments, suspended accounts, and Meta's decision to stop accepting the card—not any alleged misrepresentation. *See* Ex. Q at 2 (Ruby Labs: "we lose more money than we make with cashback" "due to delivery disruption"); Ex. U at 2 (Charmander Media: risk that Meta would ban accounts using the card); Ex. R at 3 (Cubert.co: "instructed that dash.fi cards can no longer be used on meta's platform"); *id.* Ex. P at 9 (Run Media: "accounts and BMs are blowing up left and right"). Dash.fi therefore has not demonstrated that any statement by Meta proximately caused its harm.

### 3. Meta's Messages Are Not "Commercial Advertising Or Promotion"

The Lanham Act reaches only statements made "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). A statement must therefore be both "for the purpose of influencing consumers to buy defendant's goods or services" and "disseminated sufficiently to the relevant purchasing public." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th

Cir. 1999) (citation omitted). "[N]ot all commercial speech is promotional," and the Act does not encompass all commercial speech. *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020). Thus, in *Prager*, YouTube's statements concerning its content-moderation policies were not promotional because they "were made to explain a user tool, not for a promotional purpose to 'penetrate the relevant market.'" *Id.* (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002)).

The challenged statements served the same explanatory function as those in *Prager*. Each message explained how Meta's payment and integrity controls applied to a particular advertiser; none sought to persuade anyone to buy anything. *See* Johnson Decl. Ex. M at 4, Ex. N at 2, Ex. Q at 2, Ex. U at 2. The "virtual bank" message illustrates the point. Dash.fi says Meta told advertisers the card was "issued by a non-compliant 'virtual bank.'" Mot. 11. But Larine's account of Meta's response states, "Meta's payment system requires certain verification checks that some virtual banks may not support." ***Dash.fi selectively omits the next sentence***: "These checks are automated." Johnson Decl. Ex. N, at 2; *compare id.* ¶ 49, *and* Mot. 11. An explanation of automated checks in response to Larine's question about "why [it] can't add a Dash Card," Johnson Decl. Ex. N, at 2, is not promotion. And the message does not mention Dash.fi at all.

Only one challenged statement even mentions a Meta service: Meta told Ruby Labs that it could "use [a] clean payment method or switch to Line of Credit." Johnson Decl. ¶ 61; Mot. 15. But Meta's credit line is not a competing card. It is a billing method that consolidates charges for Meta advertising into a monthly invoice, and Meta earns nothing beyond the ads the customer was already buying. *See* Jablonicky Decl. Ex. 6. The same is true of the monthly invoicing that Meta required certain advertisers to use instead of credit cards, which Dash.fi does not claim involved any false statement. *See* Johnson Decl. ¶ 39; Mot. 6. Dash.fi, by contrast, sells a Mastercard-branded corporate card, Johnson Decl. ¶¶ 2-3, from which Dash.fi earns revenue: "We make our money on the card," and "[w]ithout the card we earn no interchange." *Id.* Ex. P at 4. Telling an advertiser that it may pay Meta by invoice or with another "clean payment method" is not an effort to penetrate the market for corporate credit cards, but to ensure that Meta is, in fact, paid for ads it provides.

The challenged statements also were not "disseminated sufficiently to the relevant

purchasing public." *Coastal Abstract*, 173 F.3d at 735 (citation omitted). Dash.fi identifies statements reported by only four advertisers. Mot. 11-13; Johnson Decl. Ex. M at 4, Ex. N at 2, Ex. Q at 2, Ex. U at 2. Those account-specific explanations were "not made available to the public." *Prager*, 951 F.3d at 1000. They therefore do not show the "organized campaign to penetrate the relevant market" that the Act requires; "businesses harmed by isolated disparaging statements do not have redress under the Lanham Act." *Fashion Boutique*, 314 F.3d at 57; *accord Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1121 (9th Cir. 2021).

*Fashion Boutique* does not save Dash.fi's claim. Although that decision left "open the possibility" of liability for "a well-enforced policy to disparage [a] competitor each time it is mentioned by a customer," Mot. 13 (quoting 314 F.3d at 58), it held that twenty-seven oral statements in "a marketplace of thousands of customers" were insufficient, 314 F.3d at 58. Even its dictum requires a policy that "successfully reaches a substantial number of the competitor's potential customers." *Id.* Dash.fi identifies only four advertisers among the millions of U.S. businesses that advertise on Meta's platforms. Johnson Decl. ¶ 2; Larsen Decl. ¶ 3. The interactions with these four, discussed above, do not even hint at a policy to disparage a competitor. Instead, they reflect Meta's legitimate application of its payment decision across its own platform.

### B. Dash.fi's Tortious Interference Claims Are Unlikely to Succeed

Dash.fi's tortious-interference claims (Counts II and III) seek to transform Meta's decision not to accept the Dash.fi Card into a tort. Neither claim is likely to succeed. Because Dash.fi's cardholder relationships are at will, both claims require an independently wrongful act, and Dash.fi identifies none. The claims also fail because Meta acted to protect legitimate business interests. *See BrandTotal Ltd.*, 499 F. Supp. 3d at 739-42.

#### 1. Dash.fi Identifies No Independently Wrongful Act

Because "parties to at-will contracts have no legal assurance of future economic relations," a plaintiff alleging interference "must allege that the defendant engaged in an independently wrongful act." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1147–48 (2020). The same requirement applies to a claim for interference with prospective economic advantage. *Id.*

Dash.fi's cardholder relationships are at will. Dash.fi describes its agreements as

"authorizing Dash.fi to manage payment cards and pursue refunds and chargebacks," Mot. 15, but the agreements contain no fixed term or spending commitment. A cardholder "can close [its] Account at any time and for any reason," while Dash.fi and its issuing bank may close an account "at [their] discretion" and bear no liability for doing so "for any reason, or no reason at all," Johnson Decl. Ex. D § 3.9. The Ad Pay Protection terms likewise require cardholders to make the card their default payment method only "where allowed," and permit Dash.fi to "end or suspend the program at any time." *Id.* Ex. E §§ 5.1, 12.1. These relationships therefore "may be terminated, by its terms, at the prerogative of a single party," leaving the other party "no legal claim to the continuation of the relationship." *Ixchel*, 9 Cal. 5th at 1147. Accordingly, Dash.fi must show some independently wrongful conduct rather than merely that some cardholders "pulled back or sought alternatives," Mot. 16, as a result of Meta's actions.

Dash.fi cannot do so. An act is independently wrongful only if it is "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003). Dash.fi invokes no such standard beyond its other deficient claims. Its Lanham Act claim fails for the reasons explained above. *Supra* § II.A. The UCL claim adds nothing: the "unlawful" theory rests on the same Lanham Act claim and on "Meta's tortious interference" itself, Mot. 18; Compl. ¶ 82, but a plaintiff "may not 'bootstrap' its claims on one another" in that manner, *Republican Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099, 1114 (E.D. Cal. 2024). Dash.fi's "unfair" theory also fails. *Infra* § II.C.1.

What remains are conclusory characterizations of Meta's conduct as "anticompetitive," and "retaliatory." Compl. ¶ 76. But "[a]n act is not independently wrongful merely because the defendant acted with an improper motive," and the tort "is not intended to punish individuals or commercial entities for their choice of commercial relationships," *Korea Supply*, 29 Cal. 4th at 1138, 1158–59. Meta's decision about which payment methods to accept therefore cannot itself supply the independently wrongful act that Dash.fi's claims require.

**2. Meta Acted For Legitimate Business Purposes**

Both tortious interference claims independently fail because Meta had a "legitimate business purpose which justified its actions." *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal.

4th 26, 57 (1998). Dash.fi's motion never addresses that defense, though courts weigh it in assessing the likelihood of success. *See, e.g.*, *BrandTotal*, 499 F. Supp. 3d at 739-42. Instead, it cites *hiQ* for the proposition that technical measures and legal threats "could well constitute" the intentional acts required for an interference claim. Mot. 16 (citing *hiQ*, 31 F.4th at 1192). But LinkedIn did "not specifically challenge," that element of the claim. 31 F.4th at 1192. The dispute was whether LinkedIn acted for a legitimate business purpose, which turns on "whether the business interest is pretextual or 'asserted in good faith.'" *Id.* at 1193 (quoting *Richardson v. La Rancherita*, 98 Cal. App. 3d 73, 81 (1979)). A party with "a present, existing economic interest to protect, such as … a prior contract of his own, … is privileged to prevent performance of the contract of another which threatens it." *Richardson*, 98 Cal. App. 3d at 81.

Meta had two concrete interests to protect. First, Meta acted to secure payment for already-delivered advertising. Meta generally charges an advertiser's card after the ads run, so a chargeback reverses payment for service already rendered. Larsen Decl. ¶¶ 6, 15. And no small sum was at issue: Dash.fi says that, [redacted]. Johnson Decl. ¶ 21. This interest is far stronger than the ones found wanting in *hiQ*. LinkedIn's interests were "relatively weak" because it had "only a non-exclusive license to the data shared on its platform, not an ownership interest," and there was evidence it acted "in furtherance of LinkedIn's own plans to introduce a competing professional data analytics tool." *hiQ*, 31 F.4th at 1193-94. Meta, by contrast, acted to protect its right to be paid under "prior contract[s] of [its] own," *Richardson*, 98 Cal. App. 3d at 81, and offers no comparable ad-audit service. *See infra* § II.C.1; Larsen Decl. ¶ 29. Moreover, *hiQ* weighed LinkedIn's justification against the heightened protection that California gives binding contracts, where "contractual stability is generally accepted as of greater importance than competitive freedom." 31 F.4th at 1192. It did not address at-will relationships like Dash.fi's, which are "not cemented in the way that a contract not terminable at will is." *Ixchel*, 9 Cal. 5th at 1147; *see supra* § II.B.1.

Second, Meta acted to protect the integrity of its platform: Dash.fi says that it "could replace blocked cards with cards issued under new BINs" and began "rotating the Dash.fi Cards" specifically "to combat the card declines and BIN blocks initiated by Meta." Compl. ¶ 30; Johnson

Decl. ¶¶ 27, 34. Meta then restricted Dash.fi's accounts for conduct that "tries to find a way around our rules." Johnson Decl. ¶¶ 71-73, Ex. V, at 2; Jablonicky Decl. Exs. 4 (Advertising Standards), 5 (Account Integrity). Courts in this District have recognized that a comparable "legitimate business interest" defeated a likelihood of success on interference claims, *BrandTotal Ltd.*, 499 F. Supp. 3d at 741–42; *see also BiT Glob. Digit. Ltd.*, Dkt. 32 at 35-37. Meta's actions served the same legitimate interests here.

**C. Dash.fi's UCL Claim Is Unlikely to Succeed**

Dash.fi argues that its UCL claim "alone" warrants relief. Mot. 18. The claim cannot bear that weight, let alone for an order requiring Meta, within 24 hours, to "take all steps reasonably necessary" to enable the card and to restore Dash.fi's accounts. Dkt. 14-2 ¶¶ 3, 7. The UCL does not reach that far. "Courts may not simply impose their own notions of the day as to what is fair or unfair." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999).

**1. Meta's Refusal To Accept The Dash.fi Card Is Not "Unfair"**

Dash.fi invokes *Cel-Tech*'s test, under which conduct is "unfair" if it "threatens an incipient violation of an antitrust law … or otherwise significantly threatens or harms competition." Mot. 17 (quoting *NJOY, LLC v. iMiracle (HK) Ltd.*, 760 F. Supp. 3d 1070, 1080 (S.D. Cal. 2024)); *see also Cel-Tech*, 20 Cal. 4th at 187, but makes no attempt to satisfy that test. It identifies no antitrust law, no relevant market, and no market power, nor does it explain how competition, as opposed to Dash.fi, has been harmed. It simply lists Meta's actions—"declining the Dash.fi Card, blocking its BINs, making false statements about Dash.fi and steering advertisers to Meta's credit line, blocking Dash.fi's API access, banning Dash.fi and its employees from Meta's platforms, and demanding that Dash.fi cease all activity on those platforms"—and calls them unfair. Mot. 17. Each is a decision to stop doing business with Dash.fi or a message addressed above. *Supra* §§ II.A-B.

Meta's conduct is a refusal to deal, and absent "an abuse of monopoly power in a relevant market," "the right to refuse to deal remains sacrosanct." *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 667 (2005). *BrandTotal* found no likelihood of success on an "unfair"-prong claim challenging Facebook's decision to cut off a company's access: although that enforcement (unlike this one) "could be seen as intended to block a potential competitor,"

Facebook had "significant countervailing interests in enforcing its terms of service." 499 F. Supp. 3d at 743. Dash.fi's complaint gestures at "distorting competition among payment-card issuers," Compl. ¶ 83, but Dash.fi defines no market and offers no evidence of Meta's power in one. That kind of "very general allegation" does not satisfy *Cel-Tech*. *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1137 (9th Cir. 2014). Nor has Dash.fi identified harm to competition. "Injury to a competitor is not equivalent to injury to competition." *Cel-Tech*, 20 Cal. 4th at 186. Indeed, in Dash.fi's account, advertisers blocked from using its card "could continue using other cards," Johnson Decl. ¶ 27, and its own exhibits show other card providers competing for the same customers. *Id.* Ex. U, at 3.

Dash.fi's authorities do not fill these gaps. Dash.fi calls this case "on all fours with *hiQ*," Mot. 2, which addressed platforms holding "vast amounts of public data" being "permitted selectively to ban only potential competitors from accessing and using that otherwise public data," resulting in the "complete exclusion of the original innovator." 31 F.4th at 1193-94. None of *hiQ*'s premises is present here. Dash.fi seeks no public data; it seeks to compel Meta to accept Dash.fi's card as payment for Meta's own services and to restore Dash.fi's access to its customers' Meta advertising accounts for the benefit of its ad-audit service. Mot. 1-2; Johnson Decl. ¶ 45. Meta does not issue payment cards or sell ad-auditing services, so it has no competing product to protect. Larsen Decl. ¶¶ 4, 29. And Dash.fi faces no "complete exclusion"; by its own account, its card "remains fully operational with other merchants and vendors." Johnson Decl. Ex. R at 2. In any event, *hiQ* expressly did not reach the plaintiff's UCL claim. 31 F.4th at 1194.

Dash.fi's Fourth Circuit authority, *Real Time Medical Systems, Inc. v. PointClickCare Technologies, Inc.*, 131 F.4th 205 (4th Cir. 2025), Mot. 17, is even further afield. The Fourth Circuit there applied Maryland's common-law tort of unfair competition rather than *Cel-Tech*'s test; the plaintiff relied on a specific federal information-blocking statute; and the defendant, which had allowed the plaintiff's automated access for "roughly eight years" "without . . . raising any concerns," restricted that access only after it "began to consider competing" with the plaintiff. *Real Time*, 131 F.4th at 215-16, 225-26. Here, by contrast, no statute requires a merchant to accept any particular payment method, Meta does not compete with Dash.fi, and Meta's concerns with Dash.fi are readily documented in Dash.fi's own filings.

Nor is Meta's rationale plausibly pretextual, for the reasons explained above. *Supra* § II.B.2.

**2. Dash.fi Identifies No Predicate Violation Of Law**

Dash.fi says the Court "need not reach" the unlawful prong. Mot. 18. In any event, that prong "'borrows' violations of other laws," *Cel-Tech*, 20 Cal. 4th at 180, and the only predicates Dash.fi offers are its Lanham Act and tortious-interference claims, Mot. 18, which fail for the reasons given above, *see supra* §§ II.A–B. The Complaint's other predicates fare no better: The False Advertising Law theory rests on the same account messages as the Lanham Act claim, Compl. ¶¶ 57, 81(b), 82, and private card-network rules that a merchant "agrees" to follow, *id.* ¶ 38, are not "law." *See Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010) ("common law violation" insufficient to satisfy UCL "unlawful" prong).

**3. Dash.fi's "Fraudulent" Theory Is Its Lanham Act Claim Relabeled**

Dash.fi's fraudulent-prong theory rests on three of the same account messages as its Lanham Act claim, Mot. 18, and Dash.fi itself says the two claims are "substantially congruent," Mot. 17; *see also Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994). It fails for the same basic reason the Lanham Act claim cannot support the relief Dash.fi seeks: The harm Dash.fi asks the Court to remedy flows from Meta's decision to stop accepting Dash.fi's card, not from anything Meta said, and an order directed at what Meta says would be a prior restraint. *See supra* §§ II.A.1–2; *infra* § V. The UCL's own causation requirement confirms the first point. A private plaintiff must "show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011). The gravamen of this claim is Meta's statements, but Dash.fi attributes its harm to "Meta's October 5, 2026 cutoff of every TransPecos Bank and Patriot Bank card." Mot. 18. That is a decision to stop accepting the card, not a statement about it.

Nor does Ruby Labs, the only advertiser Dash.fi argues was deceived, Mot. 18, show deception. As explained, *supra* §§ II.A.2, II.B.2, Ruby Labs's actions were taken in response to Meta's legitimate enforcement decisions, not to anything Meta said about Dash.fi.

## III. THE BALANCE OF EQUITIES WEIGHS AGAINST EXTRAORDINARY RELIEF

Dash.fi says the equities tip "sharply" its way because it "risks losing its entire business," while Meta's chargeback losses "are minimal compared with Meta's advertising revenue." Mot. 23. But Dash.fi's claimed harm is lost revenue, which damages can remedy. *See supra* §§ I.B–C. The harm to Meta is different in kind: Dash.fi asks the Court to override Meta's judgment about how to police its own platform and constrain its ability to do so going forward. Dash.fi's requested order would require Meta to accept a payment method that its investigation linked to a pattern of chargebacks inconsistent with genuine unauthorized-use disputes, Zadik Decl. ¶¶ 14–18, and to restore accounts it restricted after its systems found Dash.fi engaged in behavior that "tries to find a way around our rules," Johnson Decl. Ex. V at 2-3. The order would then expose Meta to contempt proceedings for any further steps to protect itself from the same card and accounts, *see infra* § V, rewarding Dash.fi's efforts to evade Meta's enforcement and potentially incentivizing similar efforts by others, *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 851 (N.D. Cal. 2020). The abuse Meta is policing is also costly. [redacted], Johnson Decl. ¶ 21, and they count against Meta in card-network monitoring programs that penalize merchants with high chargeback rates, Larsen Decl. ¶¶ 14, 42.

## IV. THERE IS NO PUBLIC INTEREST IN FORCING A COMPANY TO ACCEPT A PAYMENT METHOD

Dash.fi bears "the initial burden of showing that the injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). It rests that showing on an accusation: that Ad Pay Protection "addresses a concrete consumer-fraud problem: Meta's billing of advertisers for fraudulent clicks and invalid traffic." Mot. 24. But the order Dash.fi proposes would do nothing about Meta's billing; it would require Meta to accept Dash.fi's card and restore Dash.fi's accounts. Dkt. 14-2 ¶¶ 1-4, 7-9. And the public interest cannot rest on assuming the misconduct a plaintiff alleges. *See Stackla*, 2019 WL 4738288, at *6 (before adjudication, an "appeal to the public interest of enjoining statutory violations begs the question"). Dash.fi's own audits, moreover, attribute only a small share of charges to invalid traffic. *See* Johnson Decl. ¶ 14.

The public interest instead favors letting Meta police its platforms—so much so that the court in *BrandTotal* denied preliminary relief even though the movant had shown "a risk of irreparable harm," "serious issues going to the merits," and a balance of hardships that tipped its way, "perhaps sharply so," because "the public interest require[d] denying the extraordinary relief" it sought. 499 F. Supp. 3d at 748. *See also Stackla*, 2019 WL 4738288, at *6 ("Facebook's ability to decisively police the integrity of its platforms is without question a pressing public interest.") The same result should follow here. An order requiring Meta to accept a card program that its investigation tied to chargeback abuse would tell every program like it that the way to stay on Meta's platforms is to rotate cards and sue.

## V. THE REQUESTED RELIEF IS OVERBROAD AND NOT ADMINISTRABLE

Dash.fi's proposed order could not be entered as written. An injunction must "state its terms specifically," Fed. R. Civ. P. 65(d)(1)(B), giving "fair and precisely drawn notice of what the injunction actually prohibits," *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004). It also must be "no broader . . . than necessary to redress the injury shown." *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). Dash.fi's order fails both requirements; it also risks a First Amendment violation.

The proposed order's central command has no limit. Paragraph 1 bars Meta from declining any purchase made with "the Dash.fi Card" or "associated with a [BIN] for the Dash.fi Cards." Dkt. 14-2 ¶ 1. The carve-out for "issuer-agnostic, transaction-specific fraud controls" applies only to Meta's refusal of charges solely based on issuer identity or BIN association, *id.* ¶ 4, so as written the order would bar Meta from declining even a stolen Dash.fi card. And the order reaches "any BINs used for the Dash.fi Card," *id.* ¶ 3, a set Dash.fi controls and has already changed, *see* Johnson Decl. Ex. P at 8. Meta could not tell from the order which cards it must accept.

The order would also put the Court in charge of Meta's payment-risk systems. It would allow only fraud controls "applied evenhandedly across payment methods and supported by contemporaneous records," and would permit card-related account restrictions only if they are "neutral, platform-wide," "supported by contemporaneous records[,] and applied evenhandedly." Dkt. 14-2 ¶¶ 4, 8. However, the automated rules that Meta has in place, which already apply

evenhandedly across payments, are exactly those that Dash.fi complains of. In reality, every decline or restriction touching Dash.fi would now invite a contempt dispute. As the Supreme Court has warned in the antitrust context, "[n]o court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004).

Finally, Paragraph 5 of the order would restrict Meta's speech, Dkt. 14-2 ¶ 5, and even commercial speech may not be restrained before a determination that it is unprotected. "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973). The order upheld in *Pittsburgh Press* was "clear," swept "no more broadly than necessary," and took effect only after a "final determination" that the speech was unprotected. *Id.* Paragraph 5 fails each test. It would take effect before any final determination that a single statement is false. It is not limited to advertising: It governs what Meta tells "Mastercard, TransPecos Bank, Patriot Bank, N.A., any payment processor or acquiring or issuing bank," Dkt. 14-2 ¶ 5, the networks and banks with which Meta handles disputed charges, *see* Johnson Decl. ¶ 19. It reaches accurate statements of Meta's own decisions, restricting Meta from saying the card is "not permitted, or unsupported on Meta's platforms," *id.*, though that is the decision Meta announced, Johnson Decl. Ex. O at 2; *id.* Ex. S at 3. And it permits any covered statement only with "a good-faith basis supported by contemporaneous records for the specific statement made," Dkt. 14-2 ¶ 5, leaving Meta to guess, on pain of contempt, whether its records will later be found sufficient.

## VI. ANY INJUNCTION SHOULD BE CONDITIONED ON A BOND

If the Court grants any relief, it should require Dash.fi to give security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Dash.fi asks the Court to waive a bond because its order would "restore the status quo" and Meta's damages "would be de minimis." Mot. 25. But Dash.fi's own authority applies only "when [the court] concludes there is no realistic likelihood of harm to the defendant." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

Here, Meta's likely financial harm is not just realistic but measurable.

Requiring a bond is essential because a wrongfully enjoined party is presumptively entitled to "recover provable damages up to the amount of the bond." *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036 (9th Cir. 1994). That is why the court in *Apple, Inc. v. Samsung Elecs. Co.* set a bond of $95,637,141.60 based on the enjoined party's projected loss through trial, explaining that "the amount of the bond is an upper limit on an injured party's redress for a wrongful injunction" and "district courts should err on the high side." 877 F. Supp. 2d 838, 918 (N.D. Cal. 2012), *rev'd on other grounds*, 695 F.3d 1370 (Fed. Cir. 2012).

If it issues Plaintiff's requested injunction, the Court should therefore order Plaintiff to post a bond in the amount of Meta's projected chargeback losses—estimated at $93.1 million over the life of this litigation—for as long as the injunction remains in effect. This figure is based on Dash.fi's statement that [redacted] Johnson Decl. ¶ 21, or approximately $2.6 million per month over the 15 months from July 2025 through September 2026. Meta expects chargebacks on these cards to continue if it is required to accept them. Larsen Decl. ¶ 41. In this District, the median time from filing to trial in civil cases has averaged 35.8 months over the six years ending June 30, 2026, with annual medians ranging from 26.9 to 48.9 months. Jennings Decl. Ex. 5 at 2. At $2.6 million per month, 35.8 months of chargebacks would total approximately $93.1 million.

## VII. NO INJUNCTION SHOULD ISSUE WITHOUT EXPEDITED DISCOVERY

Finally, if the Court is inclined to grant injunctive relief, it should not do so without permitting Meta to take the limited discovery necessary to test Dash.fi's assertions of irreparable harm. As explained, *supra* § I.B; *see also* § I.A, there are very serious questions about—for example—whether Dash.fi's claims of business extinction are supported by the facts. If the Court is inclined to rely on those assertions, Meta requests the opportunity to test them through a one-month limited discovery period, which should permit Meta adequate time to conduct the necessary depositions and document discovery before the end of Dash.fi's self-reported two-month lifespan.

## CONCLUSION

The Court should deny Dash.fi's motion.

Dated: October 9, 2026

Respectfully submitted,

By: */s/ Sonal N. Mehta*

Sonal N. Mehta (Bar No. 222086)
sonal.mehta@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Molly Jennings (*pro hac vice*)
molly.jennings@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6443
Facsimile: (202) 663-6363

*Attorneys for Defendant Meta Platforms, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of October, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

*/s/ Sonal N. Mehta*
Sonal N. Mehta