JEFF K. JOYNER (SBN 180485)
jjoyner@glaserweil.com
GIANNA SEGRETTI (SBN 323645)
gsegretti@glaserweil.com
ROBERTO C. ARBULU (SBN 340381)
rarbulu@glaserweil.com
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
Phone: (310)553-3000
Fax: (310) 556-2920

PETER M. BRANSTEN (SBN 113352)
pbransten@glaserweil.com
GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Phone: (415) 510-4815
Fax: (415) 510-4790

*Attorneys for Plaintiff*
*DASH.FI TECHNOLOGIES INC.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

DASH.FI TECHNOLOGIES INC.,

Plaintiff,

v.

META PLATFORMS, INC., a Delaware corporation,

Defendant.

CASE NO.: 3:26-cv-11130-RFL

Hon. Rita F. Lin

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Glaser Weil

# TABLE OF CONTENTS

I. INTRODUCTION ........ 1
II. ARGUMENT ........ 1
A. Dash.fi Will Suffer Irreparable Harm Absent Relief ........ 1
1. Dash.fi's Showing of Imminent Extinction Is Documented ........ 1
2. Dash.fi Is Dependent on Meta-Related Activity ........ 2
3. The Harm Cannot Be Remedied by Damages ........ 3
4. Dash.fi Did Not Delay ........ 4
5. Dash.fi's Injuries Are Not Self-Inflicted ........ 5
B. Dash.fi Has Shown a Likelihood of Success on the Merits ........ 7
1. Dash.fi Will Likely Succeed on Its Tortious Interference Claims ........ 7
2. Dash.fi Will Likely Succeed on Its UCL Claim ........ 9
3. Dash.fi Will Likely Succeed on Its Lanham Act Claim ........ 12
C. The Balance of Equities Tips in Favor of Dash.fi ........ 14
D. The Public Interest Favors an Injunction ........ 15
E. The Court Should Not Require a Bond ........ 15
III. CONCLUSION ........ 15

## TABLE OF AUTHORITIES

### CASES

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) .......... 5

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470 (9th Cir. 1985) .......... 2

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147(9th Cir. 1997) .......... 12

*Arenas v. Shed Media U.S. Inc.*, 881 F. Supp. 2d 1181 (C.D. Cal. 2011) .......... 5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) .......... 11

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) .......... 9, 10, 12

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999) .......... 14

*Crown Imports, LLC v. Superior Court*, 223 Cal. App. 4th 1395 (2014) .......... 7

*Epic Games, Inc. v. Apple Inc.*, 2020 WL 5073937 (N.D. Cal. Aug. 24, 2020) .......... 6, 14

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) .......... 10

*F.T.C. v. Willms*, No. C11-828 MJP, 2011 WL 4103542, at *10 (W.D. Wash. Sept. 13, 2011) .......... 15

*Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720 (N.D. Cal. 2020) .......... 4

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002) .......... 14

*Garcia v. Google, Inc.*, 786 F.3d 733, (9th Cir. 2015) .......... 1

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) .......... 1

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) .......... 11

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,

402 F. Supp. 3d 767 (N.D. Cal. 2019) .......... 9

*Ixchel Pharma, LLC v. Biogen, Inc.*,
9 Cal. 5th 1130 (2020).......... 7

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003).......... 7

*L.A. Memorial Coliseum Commission v. National Football League*,
634 F.2d 1197 (9th Cir. 1980).......... 3

*Lag Shot LLC v. Facebook, Inc.*,
545 F. Supp. 3d 770 (N.D. Cal. 2021) .......... 2

*Law Offices of Mathew Higbee v. Expungement Assistance Servs.*,
214 Cal. App. 4th 544 (2013).......... 10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 13

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004).......... 11

*NJOY, LLC v. iMiracle (HK) Ltd.*,
760 F. Supp. 3d 1070 (S.D. Cal. 2024) .......... 10

*Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*,
181 F.4th 961 (9th Cir. 2026).......... 4

*Nutrition Distribution LLC v. Lecheek Nutrition, Inc.*,
2015 WL 12659907, at *7 (C.D. Cal. June 5, 2015).......... 4

*OpenAI, Inc. v. Open A.I., Inc.*,
719 F. Supp. 3d 1033 (N.D. Cal. 2024) .......... 4

*Prager Univ. v. Google LLC*,
951 F.3d 991 (9th Cir. 2020).......... 13

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
131 F.4th 205 (4th Cir. 2025).......... 12

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991).......... 4

*Richardson v. La Rancherita*,
98 Cal. App. 3d 73 (1979).......... 9

*Stackla, Inc. v. Facebook Inc.*,
2019 WL 4738288, at *5 (N.D. Cal. Sept. 27, 2019).......... 2, 15

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001).......... 4

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) .......... 10

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .......... 11

**STATUTES**

15 U.S.C. § 1116(a).......... 6, 13, 14

15 U.S.C. § 1125(a)(1)(B).......... 7

Cal. Bus. & Prof. Code § 17500.......... 8

Cal. Civ. Code § 1668 .......... 9

Glaser Weil

## I. INTRODUCTION

Meta's opposition rests on two failed premises: that Dash.fi's declared extinction isn't sufficient, and that Meta is merely a merchant choosing which cards to accept. [redacted] Declaration of Shanyn Stewart ("Stewart Decl.") ¶ 44, Ex. M. That threat to its existence is irreparable harm. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022). Second, Meta did not simply decline a card. It disparaged Dash.fi to customers while steering them to Meta's own credit products, blocked every Dash.fi BIN, cut off Dash.fi's account and API access, and billed advertisers for invalid traffic. Johnson Decl. (ECF No. 14-3) ¶¶ 17, 47–55, 61–62, 71–73. That conduct makes Dash.fi likely to succeed on its tortious interference, Lanham Act, and UCL claims, and it is what Dash.fi asks the Court to halt before the company is gone.

## II. ARGUMENT

Meta treats each *Winter* factor for injunctive relief as an independent hurdle, but the Ninth Circuit applies a sliding scale under which "a stronger showing of one element may offset a weaker showing of another[.]" *LinkedIn*, 31 F.4th at 1188. Where the balance of hardships tips sharply in the movant's favor, only "serious questions going to the merits" suffice. *Id*. Even under the heightened standard Meta invokes for mandatory injunctive relief, Opp. at 13:2–4, a standard that does not apply here because Dash.fi is not seeking affirmative relief, *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015), the law and facts clearly favor Dash.fi.

### A. Dash.fi Will Suffer Irreparable Harm Absent Relief

#### 1. Dash.fi's Showing of Imminent Extinction Is Documented

Meta cites authorities holding that an executive's "mere assertions" or "ipse dixit" cannot establish a threat of extinction, Opp. at 10:24–11:6, but each turned on the absence of corroborating

financial evidence. *Lag Shot LLC v. Facebook, Inc.*, 545 F. Supp. 3d 770, 787 (N.D. Cal. 2021) (***only*** an executive's statement that plaintiff would "likely go out of business"); *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *5 (N.D. Cal. Sept. 27, 2019) (CEO's ***speculation*** about a "tipping point"); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) (***only*** an executive's statement of past and forecast losses).

[redacted] Stewart Decl. ¶¶ 9, 12, Exs. B, C. [redacted] *Id.* [redacted] *Id.* ¶ 13, Ex. C. [redacted] *Id.* This is the evidence Meta's authority requires, Opp. at 10:22–24, and [redacted]. Johnson Decl. ¶ 83.

**2. <u>Dash.fi Is Dependent on Meta-Related Activity</u>**

Meta also asserts that Dash.fi is a "diversified fintech" whose "general-purpose" card is used at other merchants and for Google ad spend. Opp. at 9:24–10:8. That argument conflates what customers spend with what Dash.fi earns. Dash.fi only earns income from interchange fees from card spend and its Ad Pay Protection program ("APP")—and Meta revenue is primarily driven by APP. [redacted] Stewart Decl. ¶¶ 23–24, 42, Exs. F, K.

Measured by what Dash.fi earns and keeps, it is Meta-dependent in exactly the way the plaintiff hiQ was LinkedIn-dependent in *LinkedIn Corp.*, 31 F.4th 1180. [redacted]

[redacted] Stewart Decl. ¶ 5, Ex. A. [redacted] *Id.* ¶¶ 14, Exs. C, F. Other product lines cannot come close to replacing what Meta has cut off; surviving without that access would require Dash.fi to "fundamentally change the nature of its business." *LinkedIn*, 31 F.4th at 1189.

Meta's argument that customers can use the card elsewhere also fails. Opp. at 10:1–6. [redacted] Stewart Decl. ¶ 29. [redacted] *Id.* [redacted] Stewart Decl. ¶ 14, Ex. C.

**3. <u>The Harm Cannot Be Remedied by Damages</u>**

Meta argues that because Dash.fi can quantify its losses monetary damages are an adequate remedy. Opp. at 11:19–20. *L.A. Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980), states the general rule "monetary injury is not normally considered irreparable," but it did not involve a business facing insolvency. A threat of extinction is irreparable "even when damages may be available and the amount of direct financial harm is ascertainable." *LinkedIn*, 31 F.4th at 1188. [redacted] Stewart Decl. ¶ 3, Ex. B.

The evidence also shows the loss of goodwill with new and prospective customers, which Meta incorrectly dismisses as "repackaged" revenue loss. Opp. at 11:16–17. [redacted]



Glaser Weil

[redacted] Stewart Decl. ¶ 30. [redacted] *Id.* [redacted] *Id.* ¶ 30, Ex. G. [redacted] *Id.* ¶ 30. Such losses are irreparable because they are difficult to value. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 736 (N.D. Cal. 2020).

Meta's cited authorities hold only that a plaintiff must explain why such harm cannot be remedied by money. *Nutrition Distribution LLC v. Lecheek Nutrition, Inc.*, 2015 WL 12659907, at *7 (C.D. Cal. June 5, 2015); *Xport*, 694 F. Supp. 3d at 1270. Customers who never sign up and new customers whose spend shrinks cannot be valued with precision, which is why the Court in *BrandTotal* found such losses "difficult to valuate." *BrandTotal*, 499 F. Supp. 3d at 736. In addition, the Ninth Circuit has applied its rule that "damage to ongoing recruitment efforts and goodwill" is irreparable in other contexts. *Rent-A-Center*, 944 F.2d at 603; *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 977 (9th Cir. 2026). Here, Dash.fi employees refused to return to work based on Meta's false accusations because Meta addressed its cease-and-desist letter to the employees individually and shut down their personal Facebook accounts. Johnson Decl. ¶ 77.

**4. <u>Dash.fi Did Not Delay</u>**

Meta's claim of "yearslong delay" ignores that its conduct was initially invisible and that delay is only one factor, not an automatic bar. Opp. at 8:1–17. Moreover, "courts are loath to withhold relief solely because of delay, which is not particularly probative in the context of ongoing, worsening injuries." *OpenAI, Inc. v. Open A.I., Inc.*, 719 F. Supp. 3d 1033, 1051 (N.D. Cal. 2024).

First, the existential harm did not exist in 2025. Meta's earlier declines were invisible to Dash.fi, Meta refused to explain them, and Mastercard reported the BINs "very healthy," so Dash.fi responded by rotating cards to address the issue. Johnson Decl. ¶¶ 23–24, 29–30, 34. Meta did not confirm it was targeting Dash.fi until September 23, 2026. *Id.* ¶¶ 71–73, Ex. V. [redacted] Stewart Decl. ¶ 10, Ex. F. [redacted] Stewart Decl. ¶ 27. A plaintiff does not delay by failing to sue over harm that was not yet existential.

Second, Dash.fi acted promptly once the threat became clear, filing suit five days after Meta's cease-and-desist letter and moving for emergency relief and submitting substantial evidence to the Court immediately thereafter. Opp. at 7:10–16. Unlike Meta's cited cases, which concerned discrete events, Dash.fi's harm is ongoing and worsening. Meta says it "is still evaluating how to implement" its October 5 policy, Opp. at 7:8–9 (citing Larsen Decl. ¶ 39), meanwhile Meta ad spend on Dash.fi's cards continues to fall. [redacted] Stewart Decl. ¶¶ 28, 31–32, Exs. F, G, H. Stewart Decl. ¶ 17, Ex. D. Relief now can still prevent Dash.fi's cash from running out, but relief after December 18 will be too late.

### 5. <u>Dash.fi's Injuries Are Not Self-Inflicted</u>

Meta's argument that Dash.fi's injuries are "self-inflicted" relies on authorities that involved harm flowing from the plaintiff's own undisputed conduct, unlike here. Opp. at 12:7–13; *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (government's harm from complying with injunction against its own policy); *Xport*, 694 F. Supp. 3d at 1271 (plaintiff breached contract and failed to pay); *Arenas v. Shed Media U.S. Inc.*, 881 F. Supp. 2d 1181, 1194 (C.D. Cal. 2011) (plaintiff's own

publicized behavior); *BrandTotal*, 499 F. Supp. 3d at 736 (movant's own allocation of funds). Here, the conduct Meta improperly calls an alleged "scheme" consists of legitimate cardholder-authorized refund requests and Mastercard chargebacks due to Meta's fraudulent billing practices, which Meta either declined to contest or conceded. Declaration of Sam Vallandingham ("Vallandingham Decl.") ¶¶ 11, 15–19. Meta ignores that Dash.fi's harm flows from Meta improperly declining the card and blocking BINs, disparaging Dash.fi, and cutting off Dash.fi's accounts and API access. Johnson Decl. ¶¶ 52–55, 71–73.

Meta's reliance on *Epic Games, Inc. v. Apple Inc.*, 2020 WL 5073937 (N.D. Cal. Aug. 24, 2020), Opp. at 12:10–12, backfires. In *Epic Games*, the court denied a TRO as to Fortnite's removal because Epic had knowingly breached its agreements by secretly activating an unapproved payment mechanism. *Epic Games*, 2020 WL 5073937 at *3. But it nonetheless granted a TRO barring Apple from terminating Epic affiliates' developer accounts and cutting off tools supporting the Unreal Engine, because that retaliation went beyond the contract dispute and threatened irreparable harm to a separate business and to third-party developers who relied on it. *Id.* at *4. Unlike Epic, Dash.fi has breached no agreement with Meta, and its chargebacks were cardholder-authorized and processed under Mastercard's rules. Vallandingham Decl. ¶¶ 11, 16–18. Just as the Court in *Epic Games* enjoined Apple's retaliatory block of developer accounts and tools, Meta's retaliation with platform-wide exclusion—blocking every BIN, refusing all TransPecos and Patriot Bank cards, and disabling Dash.fi's business, API, and employees' personal Facebook accounts—reaches far beyond any disputed charge, Vallandingham Decl. ¶¶ 29–30, and cuts off the access on which Dash.fi and the advertisers who rely on Ad Pay Protection depend. Johnson Decl. ¶¶ 7–16, 53, 55, 71–73, Ex. V.

Because Dash.fi faces documented, imminent extinction and an ongoing loss of goodwill that money cannot repair—and is independently entitled to the presumption under 15 U.S.C. § 1116(a)—this factor weighs decisively in favor of relief.

Glaser Weil

**B. Dash.fi Has Shown a Likelihood of Success on the Merits**

**1. Dash.fi Will Likely Succeed on Its Tortious Interference Claims**

**a. Meta's Interfering Conduct Is Independently Wrongful**

An act is independently wrongful if it is "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003); *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1142 (2020). A plaintiff need only show that "the conduct alleged to constitute the interference was independently wrongful." *Crown Imports, LLC v. Superior Court*, 223 Cal. App. 4th 1395, 1404 (2014). Contrary to Meta's assertion, Opp. at 16:23–17:19, Dash.fi has identified Meta's interfering acts that independently violate both federal and state law—notwithstanding Dash.fi's UCL claim.

*First*, Meta did not merely decline a payment method; it violated the Lanham Act by making objectively false statements about Dash.fi to its cardholders and prospective customers that caused them to cease doing business with Dash.fi. Johnson Decl. ¶¶ 3–6, 29–30, 47, 49, 61–62, Exs. A–C, H, M, N, Q. Significantly, Meta's Opposition never disputes the falsity of these statements, their impact is clear. Specifically, Ruby Labs concluded from Meta's false statements that Dash.fi's partners "run fraudulent business" and removed its Dash.fi's cards, and Charmander Media declined to proceed "[f]or that reason." *Id.* ¶¶ 61–62, 69–70, Exs. Q, U. False statements about a competitor's product are proscribed by 15 U.S.C. § 1125(a)(1)(B). *See Korea Supply*, 29 Cal. 4th at 1159. In addition, Meta's argument as to the Lanham Act claim, Opp. at 17:15–16, is beside the point because the test is whether the conduct is "proscribed" by law, not whether a separate count will prevail. Indeed, in *Korea Supply*, the UCL claim failed for want of an available remedy, yet the same unlawful conduct supported the interference claim. *Korea Supply*, 29 Cal. 4th at 1152, 1159.

*Second*, the same false statements also violate California's False Advertising Law. Each challenged statement concerned Meta's own services. Meta made them at the point of sale, when

Glaser Weil

advertisers tried to pay for or continue running ads, and each statement told the advertiser why Meta would not provide those services or on what terms it would. Meta itself describes the messages as "explain[ing] how Meta's payment and integrity controls applied to a particular advertiser." Opp. at 15. In declining to provide its services, Meta told advertisers that Dash.fi's cards failed Meta's bank-verification requirements because it came from a "virtual bank," Johnson Decl. ¶ 49, Ex. N; that their accounts were shut down because of a "Risk Payment – confirmed compromise," *id.* ¶ 47, Ex. M; and that their accounts were suspended for a "suspicious payment method," *id.* ¶¶ 61–62, Ex. Q. Each statement concerned a "circumstance or matter of fact connected with the proposed performance" of Meta's services. Cal. Bus. & Prof. Code § 17500. Thus, Meta's argument that improper motive alone is insufficient, Opp. at 17:20–25, is misplaced because Dash.fi's claim rests not on motive but on the false statements and deceptive practices that federal and state law independently forbid, each tied to a specific statement, customer, and lost relationship. Johnson Decl. ¶¶ 47–70, Exs. M–U.

**b. <u>Meta Has No Legitimate Business Purpose in Knowingly Billing Invalid Traffic</u>**

Meta does not dispute that it charges advertisers for invalid traffic because it cannot. Its public Business Help Center admits that invalid clicks occur on its platform and promises that "***[y]ou will not be charged for clicks that are determined to be invalid***." Arbulu Decl. ¶ 4, Ex. A (emphasis added). Yet Meta asserts, in its Opposition, Self-Serve Ad Terms stating that it is "not responsible for click fraud . . . or other potentially invalid click activity." Opp. at 3:5–7; Larsen Decl. ¶ 19. Again contradicting itself, although Meta invites advertisers to report "suspicious or potentially invalid click activity" for "a manual review," Arbulu Decl. ¶ 4, Ex. A, Meta "immediately rejected or ignored nearly all" of Dash.fi's audit-backed refund requests, Johnson Decl. ¶ 17, asserting that its "policies do not provide for refunds solely on the basis of 'auditor' claims." Opp. at 3:23–24. In other words, Meta thus charges for a service it knows, or has reason to know, was never delivered, and refuses to

correct the charge even when shown credible evidence. That is not a billing policy; it is the knowing collection of money that is not owed.

Meta cannot contract around that liability. "[A]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud . . . or violation of law . . . are against the policy of the law." Cal. Civ. Code § 1668. Applying § 1668, this Court refused to let Facebook use an exculpatory clause in its user terms to defeat a deceit claim. *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 800 (N.D. Cal. 2019). To the extent the Self-Serve Ad Terms purport to excuse Meta from knowingly charging for invalid traffic, they are unenforceable. That defeats Meta's "legitimate business purpose" defense. Opp. at 17:26–19:6.

Meta attempts to mince words and mislead the Court by stating in the Opposition that it acted "to secure payment for already-delivered advertising" under "prior contract[s] of [its] own." *Id.* at 18:11–20 (quoting *Richardson v. La Rancherita*, 98 Cal. App. 3d 73, 81 (1979)). Meta ignores that for invalid traffic, nothing was "already-delivered." A bot click is not the service the advertiser paid for, and the privilege *Richardson* describes belongs to a party with "a present, existing economic interest to protect"—but, here, any interest Meta claims is void under § 1668. Meta's asserted platform-integrity interest fares no better: "integrity" cannot justify disparaging a card Mastercard deemed "very healthy," or refusing the very chargebacks Meta itself conceded. Johnson Decl. ¶¶ 21, 29–30. Whether a business interest is legitimate turns on whether it is "pretextual or 'asserted in good faith.'" *LinkedIn*, 31 F.4th at 1193. Here, Meta's interest is pretextual and it cannot in good faith claim a privilege to protect revenue it had no right to collect.

**2. <u>Dash.fi Will Likely Succeed on Its UCL Claim</u>**

The UCL's unlawful prong "'borrows' violations of other laws," and "[v]irtually any law—federal, state or local—can serve as a predicate." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999); *Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214

Cal. App. 4th 544, 553 (2013). As discussed above, Meta's false statements violate the Lanham Act and the False Advertising Law and, thus, its interference rests on independently wrongful conduct, not the interference alone.

Additionally, Meta's campaign violates the policy and spirit of Section 2 of the Sherman Act. Conduct is "unfair" when it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law." *Cel-Tech,* 20 Cal. 4th at 187; *NJOY, LLC v. iMiracle (HK) Ltd.*, 760 F. Supp. 3d 1070, 1080 (S.D. Cal. 2024). A successful claim for antitrust violation is not required. The Ninth Circuit has affirmed UCL "unfair" liability against a dominant platform even where Sherman Act claims failed. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000–03 (9th Cir. 2023). Section 2 forbids maintaining or extending monopoly power through exclusionary conduct rather than "a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

Meta's claim that Dash.fi identifies no market, power, or harm to competition, Opp. at 19:17–20:8, ignores the record. Meta dominates the digital advertising market. Meta's platforms command such a large share of digital advertising that most businesses seeking meaningful online reach have no practical alternative, giving Meta leverage to dictate billing practices, payment terms, and dispute procedures. Johnson Decl. ¶ 14. Meta controls every input to an advertiser's bill—it records the clicks, calculates the charges, collects payment, and decides refunds—and offers no meaningful way to dispute invalid charges. *Id.* ¶¶ 7, 14, 17.

Dash.fi acts as a competitive check on Meta. Ad Pay Protection is an independent check on that closed system. Auditing by tracking data from cardholders' own websites, Dash.fi found that 2.4% to 3.5% of charges by Meta were derived from invalid traffic. Johnson Decl. ¶ 14. Approximately $35 million of $39 million in disputed charges were won, with Meta letting

approximately 5,400 disputes lapse and accepting approximately 4,900 more rather than arbitrate. *Id.* ¶ 21; Vallandingham Decl. ¶ 17. Dash.fi's card also competes with Meta's own payment products, its Line of Credit and monthly ACH invoicing. Johnson Decl. ¶¶ 39, 61–62. Rather than compete lawfully, Meta has engaged in exclusionary conduct by using its dominance to eliminate that rival through tactics Section 2 condemns.

*First*, Meta terminated a voluntary, profitable course of dealing. It accepted Dash.fi's card for years—more than $120 million per month of spend at its 2026 peak—then blocked every BIN, cut off Dash.fi's API and Business Manager access, banned Dash.fi and its employees, and announced it would refuse all TransPecos and Patriot Bank cards. Johnson Decl. ¶¶ 27, 45, 53–55, 71–72, 79. A monopolist's sacrifice of short-term revenue to harm a rival falls within the recognized exception to the freedom to refuse to deal on which Meta relies. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610–11 (1985); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131–32 (9th Cir. 2004). The refusal is also selective, discriminating against valid Mastercard cards based on issuing bank contrary to network rules. Vallandingham Decl. ¶¶ 27–32. A dominant platform's "implementation of technical measures selectively to ban" a dependent company constitutes unfair competition. *LinkedIn,* 31 F.4th at 1192–94.

*Second*, Meta used control of platform access to steer advertisers to its own payment products, telling them to switch to monthly ACH invoicing with "no exceptions" or risk disruption, and to "switch to Line of Credit." Johnson Decl. ¶¶ 39–41, 61–62, Exs. L, Q. Conditioning access to a dominant platform on abandoning a rival's product is a classic use of monopoly power in one market to foreclose competition in another. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1209–12 (9th Cir. 1997).

*Third*, Meta reinforced the exclusion with undisputed false disparagement, calling the card "confirmed compromise," "suspicious," and the product of a non-compliant "virtual bank," despite Mastercard's contrary assessment. Johnson Decl. ¶¶ 3–6, 29–30, 47, 49, 61–62, Exs. H, M, N, Q. A monopolist's deceptive statements about a rival are exclusionary when clearly false, clearly material, likely to induce reasonable reliance, and made to buyers without knowledge of the subject matter. *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). Meta's statements concerned whether the card was safe, were made by the platform itself when advertisers chose payment methods, could not be verified by the advertisers, and caused them to drop the card. Johnson Decl. ¶¶ 59–70, Exs. P–U.

*Fourth*, Meta's justifications are pretextual. Its "account integrity" rationale cannot be squared with Mastercard's assessment, Meta's inconsistent application of its own invoicing mandate, or its acceptance of nearly every disputed chargeback rather than arbitrating. Vallandingham Decl. ¶¶ 17, 22, 25–26. Integrity explanations that serve as cover for harming a competitor do not shield exclusionary conduct. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 238 (4th Cir. 2025).

*Fifth*, Meta conflates injury to Dash.fi with injury to competition, Opp. at 20:5–8, but the harm here falls on advertisers. By eliminating the only independent mechanism for auditing its charges, Meta preserves its ability to improperly bill for invalid traffic without challenge—leaving advertisers overpaying for services with no practical alternative. Johnson Decl. ¶ 14. At the same time, Meta forecloses a rival's payment product and diverts customers to its own Line of Credit and invoicing. *Id.* ¶¶ 39, 43, 61–62. Less choice, higher effective prices, and less accountability are effects "comparable to or the same as" a Section 2 violation. *Cel-Tech*, 20 Cal. 4th at 187.

**3. <u>Dash.fi Will Likely Succeed on Its Lanham Act Claim</u>**

Meta's three objections to the Lanham Act claim lack merit. Opp. at 13:5–16:16.

Glaser Weil

*First*, the relief Dash.fi seeks is tailored to Meta's violation. Meta argues that card-acceptance and access relief would not "prevent" a false statement. Opp. at 13:9–16 (citing 15 U.S.C. § 1116(a)). But Meta's statements and its exclusion operate together—Meta told advertisers the card was "compromised" and "suspicious" in conjunction with declining the card and steering them to its Line of Credit. Johnson Decl. ¶¶ 47–62. Paragraph 5 of the proposed order directly prevents further false statements, and the remaining relief is supported independently by the tortious interference and UCL claims. Accordingly, there is no "mismatch" between the claims and scope of relief.

*Second*, Meta's statements proximately caused injury. Meta argues that most of Dash.fi's losses preceded the first challenged statement on August 14. Opp. at 13:28–14:7. That a portion of the harm came earlier does not defeat causation as to the harm that followed. In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014), the Court ruled that injury "flowing directly from the deception . . . occurs when deception of consumers causes them to withhold trade from the plaintiff." Here, after Meta's statements, [redacted]. Johnson Decl. ¶¶ 58–61, 81–82. Ruby Labs removed its Dash.fi cards because, based on Meta's statements, it believed Dash.fi's partners "run fraudulent business," and Charmander Media declined to proceed "[f]or that reason." *Id.* ¶¶ 61–62, 69–70, Exs. Q, U. In addition, by declining Dash.fi's cards, Meta was telling advertisers the card itself was compromised.

*Third*, Meta's statements were commercial advertising or promotion. Meta incorrectly likens its statements to the content-moderation explanations in *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020). Opp. at 15:1–8. But YouTube's statements described a user tool and did not steer anyone toward a product. Meta's statements here were made to purchasers at the moment they selected a payment method, disparaged a rival product, and directed them to "switch to Line of Credit"—Meta's own payment product. Johnson Decl. ¶¶ 61–62, Ex. Q. Meta asserts it earns nothing

Glaser Weil

extra from that product, Opp. at 15:19–21, but moving advertisers to Meta-controlled billing keeps disputes in Meta's hands and away from the independent audits and chargebacks that cost it money. Johnson Decl. ¶¶ 14, 21, 39.

In addition, informal promotion—promotion not made as part of a classic advertising campaign—suffices, and the extent of distribution required is "elastic." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999). Meta's explanation proves the point: it emphasizes that its "virtual bank" message is generated by "automated" checks. Opp. at 15:10–16. An automated message delivered to advertisers who attempt to use the card is exactly the "well-enforced policy to disparage [a] competitor" that "reaches a substantial number of the competitor's potential customers." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 58 (2d Cir. 2002). The identified advertisers represent Dash.fi's several hundred cardholders; the remarks therefore were not "isolated." Johnson Decl. ¶¶ 46, 80. Dash.fi is likely to succeed on its Lanham Act claim and is entitled to the presumption of irreparable harm under 15 U.S.C. § 1116(a).

### C. <u>The Balance of Equities Tips in Favor of Dash.fi</u>

Meta's assertion that injunctive relief will incentivize others to violate its terms and policies is misleading. Contrary to Meta's conclusory statements, Dash.fi did not engage in fraudulent conduct or activities, Vallandingham Decl. ¶¶ 18–23, to "evade [Meta's] policies." Opp. at 4:26–27. Rather, Dash.fi made every effort to use Meta's dispute resolution process with no response and was forced to pursue chargebacks. Vallandingham Decl. ¶ 15. Meta then retaliated by aggressively targeting Dash.fi which has imperiled Dash.fi's ability to maintain its business as a going concern. *See Epic Games, Inc.*, 493 F.Supp.3d at 850. Thus, Dash.fi's harm is not merely lost revenue that damages can remedy. Opp. at 22:4. In comparison, Meta admits that Dash.fi's chargebacks only accounted for 0.13% of ad spend on all cards used on Meta's platforms during a 60-day period. Opp. at 5:12–13.

Needless to say, that is ad spend for invalid clicks to which Meta is not entitled. Therefore, the balance of equities tips sharply in favor of Dash.fi.

**D. <u>The Public Interest Favors an Injunction</u>**

The public has an interest in combating Meta's fraudulent billing practices. *F.T.C. v. Willms*, No. C11-828 MJP, 2011 WL 4103542, at *10 (W.D. Wash. Sept. 13, 2011). In contrast, Meta has no interest in the revenue generated by invalid traffic, and the cases cited by Meta are inapposite. *See BrandTotal Ltd.*, 499 F.Supp.3d 720, 745–48; *Stackla*, 2019 WL 4738288, at *5–6.

**E. <u>The Court Should Not Require a Bond</u>**

Not once has Meta denied the fact that the charges Dash.fi disputed through chargebacks were improper. Vallandingham Decl. ¶¶ 16–17. Essentially Meta argues that it should be entitled to a bond for anticipated ill-gotten gains of $93.1 million for fraudulent charges. Meta can simply avoid these chargeback "losses" by not charging for invalid clicks, responding to refund requests, or challenging chargebacks via the Mastercard rules. Vallandingham Decl. ¶¶ 14–16, 20. Because Meta has failed to provide evidence of how else it might be damaged by the relief sought, no bond should be required.

**III. <u>CONCLUSION</u>**

Meta's false statements, exclusion of Dash.fi's card, and steering of its cardholders are independently unlawful and will exhaust Dash.fi's cash by December 18, 2026. Because the hardships and public interest favor Dash.fi, the Court should enter the requested injunction without a bond.

DATED: October 13, 2026

GLASER WEIL FINK HOWARD
JORDAN & SHAPIRO LLP

By: ______________________
JEFF K. JOYNER
PETER M. BRANSTEN
GIANNA SEGRETTI
ROBERTO C. ARBULU

*Attorneys for Plaintiff*
*DASH.FI TECHNOLOGIES INC.*



Glaser Weil