UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DASH.FI TECHNOLOGIES INC.,

Plaintiff,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 26-cv-11130-RFL

**NOTICE OF TENTATIVE OPINION**

Re: Dkt. No. 14

Having reviewed the briefs and evidence submitted by the parties on Plaintiff Dash.fi's Motion for Temporary Restraining Order (Dkt. No. 14) and Defendant Meta's Motion to Strike (Dkt. No. 29), the Court is of the tentative opinion that the preliminary injunction should be denied and the Motion to Strike should be denied as moot.

**TENTATIVE OPINION**

To obtain preliminary injunctive relief, a plaintiff "must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011) (citation modified). Alternatively, when a plaintiff has satisfied the irreparable harm and public interest requirements, and "the balance of hardships tips sharply in the plaintiff's favor," the plaintiff need only show "serious questions going to the merits." *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (citation modified). Under either formulation of the test, a plaintiff must also show "a sufficient causal connection between the irreparable harm" and the challenged conduct. *Perfect 10,* 653 F.3d at 982; *see also Garcia v. Google, Inc.*, 786 F.3d 733,

744 (9th Cir. 2015) ("The difficulty with Garcia's claim is that there is a mismatch between her substantive copyright claim and the dangers she hopes to remedy through an injunction."). This requires a "causal nexus" between the claim upon which the plaintiff has shown a likelihood of success and the threatened irreparable harm. *See Inari Med., Inc. v. Imperative Care, Inc.*, 806 F. Supp. 3d 937, 960 (N.D. Cal. 2025) (citing *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1361 (Fed. Cir. 2013)).[1]

Dash.fi alleges four claims against Meta: (1) unfair competition – false advertising in violation of the Lanham Act, § 43(a), 15 U.S.C. § 1125(a)(1); (2) tortious interference with contractual relations; (3) tortious interference with prospective economic relations; and (4) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*. (*See* Dkt. No. 1.) These claims appear to arise out of two alleged categories of conduct.

The first category involves allegations that Meta made false statements to Dash.fi's current and prospective customers. This theory underlies all of Dash.fi's claims, including claims under all three UCL prongs. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) ("The UCL prohibits unfair competition, which it broadly defines as including any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. Each prong of the UCL is a separate and distinct theory of liability; thus, the 'unfair' practices prong offers an independent basis for relief." (citations and quotation marks omitted)).

---

[1] This "causal nexus" language comes from patent cases. The Court has thus far been unable to locate Ninth Circuit authority stating this test as clearly in non-patent cases. Obviously, though, a movant cannot obtain a preliminary injunction by combining (a) some irreparably harmful but non-actionable conduct with (b) other actionable conduct that does not cause irreparable harm. Logically, there must be a nexus between the specific conduct that is likely to be successfully challenged and the anticipated irreparable injury. *See, e.g.*, *Fin. Express L.L.C. v. Nowcom Corp.*, 564 F. Supp. 2d 1160, 1168 (C.D. Cal. 2008) ("In order to be granted a preliminary injunction, [a plaintiff] only needs to show the requisite combination of probable success on the merits and the possibility of irreparable injury with respect to any one of its claims"). If the parties are aware of more direct authority on this issue, the Court would welcome it at the hearing.

The second category involves allegations that Meta wrongfully declined and blocked Dash.fi cards, which threatened competition. Dash.fi's position as to which claims rely on these allegations has evolved over the course of the briefing. Initially, Dash.fi argued that these allegations supported the tortious interference claims and a claim under the UCL's unfair prong. (*See* Dkt. No. 14-1 at 20–22 (all citations to ECF pagination).) On Reply, Dash.fi only advocates for this theory in support of its "unfair" UCL claim. (*See* Dkt. No. 27 at 12–13 (arguing as to the tortious interference claims only that "Meta did not merely decline a payment method; it violated the Lanham Act by making objectively false statements about Dash.fi to its cardholders and prospective customers that caused them to cease doing business with Dash.fi. . . . Dash.fi's claim rests . . . on the false statements and deceptive practices that federal and state law independently forbid, each tied to a specific statement, customer, and lost relationship.").) That narrowing was appropriate because Dash.fi did not put forth evidence showing Meta's card refusals to constitute an independently wrongful act. The Court therefore considers whether Dash.fi has shown the requisite combination of serious questions going to the merits of the claims and risk of irreparable harm for each of these two categories of challenged conduct.

***False statements.*** Dash.fi has shown some potential for success on the merits as to its tortious interference and UCL claims arising out of Meta's allegedly false statements, which Meta does not appear to deny having made. However, Dash.fi has not shown that these allegedly false statements threaten to drive it out of business. To be sure, Dash.fi has shown a significant threat of business extinction from Meta's other conduct. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) ("[S]howing a threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable.). (*See also* Dkt. No. 14-3 ¶¶ 78–85.) But the record shows that this threat of extinction was not due to Meta's statements, but instead due to Meta's blocking of Dash.fi cards, including "Meta's October 5, 2026 cutoff of every TransPecos Bank and Patriot Bank card."[2]

[2] It seems doubtful that the Lanham Act's presumption of irreparable harm would apply under the promotional purpose analysis described in *Prager University v. Google LLC*, 951 F.3d 991,

(Dkt. No. 14-1 at 23.)

The timing of events described in Dash.fi's evidence confirms this causal mismatch. "By spring 2025, Meta began declining Dash.fi Card charges for certain advertisers without explanation." (Dkt. No. 14-3 ¶ 23.) By June 2025, Meta also cut off certain Dash.fi cards for which Dash.fi had initiated chargeback disputes. (*Id.* ¶¶ 21–22.) In "July 2025, Meta began blocking Bank Identification Numbers ('BINs') associated with Dash.fi Cards, disrupting spend by Dash.fi's highest-spending cardholders." (*Id.* ¶ 27.) "In September 2025, Meta began switching Dash.fi Card users to backup cards saved to their accounts without notice and auto-declining the Dash.fi Card without sending decline notices to Dash.fi." (*Id.* ¶ 28.) Aware of these declines, Dash.fi "formally began providing cardholders a white-glove service rotating the Dash.fi Cards saved to their Meta accounts" that same month. (*Id.* ¶ 34.) The following year, in "March 2026, Meta told cohorts of Dash.fi Card users to switch, by a stated deadline, to monthly invoicing offered through Meta and payable only by ACH. Meta also said it would no longer accept credit cards for their advertising accounts." (*Id.* ¶ 39.) In the following months, from April to July of 2026, Dash.fi lost significant amounts in monthly card spend on Meta. (*Id.* ¶ 43.) Up to that point, Meta had not made any challenged statements.

On August 14, 2026, Meta made its first challenged statement, telling an advertising customer that its account was disabled due to "Risk Payment – confirmed compromise," which the customer understood to mean that Meta believed the customer's "DashFi payment method may have been compromised or misused." (Dkt. No. 14-16 at 4.) On August 19, a customer told Dash.fi that it was "seeing consistent declines on multiple platforms as well as errors when trying to add a payment method on Meta." (Dkt. No. 14-17.) When the customer asked why he could not add a Dash.fi card, Meta responded:

> Meta's payment system requires certain verification checks that some virtual banks may not support. These checks are automated. To continue running ads, you'll

1000 (9th Cir. 2020). But even if it did apply, the evidence in the record is sufficient to overcome the presumption.

> need to add a payment method that supports Meta's verification requirements, such as a credit card issued by a traditional bank or another supported payment method in your region.

(*Id.*) On September 5, another customer told Dash.fi that Meta said its accounts had been "flagged for suspicious payment method" and that the customer "needed to use clean payment or switch to Line of Credit." (Dkt. No. 14-20.)

Throughout this period, from August through September of 2026, Meta also blocked the Dash.fi cards for multiple customers, including all of Dash.fi's biggest customers. (Dkt. No. 14-3 ¶¶ 48, 52, 57.) On September 11, Meta announced that it would stop accepting cards issued by the two banks through which Dash.fi processes its card transactions on October 5. (*Id.* ¶ 65.) Shortly after, a potential customer told Dash.fi that it could not risk using the service because Meta stated that it will soon be banning all accounts that use Dash.fi cards. (Dkt. No. 14-24 at 2.)

This evidence shows that much of Dash.fi's harm came before Meta made the challenged statements. And though some harm came after, that harm is not tied to Meta's statements. At most, the statements may have caused a few select customers to stop using the service. But there is no evidence that the statements were widely dispersed or that the statements threaten the viability of Dash.fi's business. Instead, the record shows that customers stopped using Dash.fi because Meta rejected and banned Dash.fi cards. No threat of irreparable harm has been shown to stem from the allegedly false statements themselves. These allegedly false statements therefore cannot provide a basis for the issuance of a preliminary injunction.

***Card refusals.*** Dash.fi has not shown a likelihood of success or even serious questions going to the merits of its "unfair" UCL claim based on Meta's refusal to accept Dash.fi cards. Dash.fi argues that Meta's card refusal scheme is unfair under the UCL because it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (Dkt. No. 14-1 at 22 (quoting *NJOY, LLC v. iMiracle (HK) Ltd.*, 760 F. Supp. 3d 1070, 1080 (S.D. Cal. 2024)).) This theory is not sufficiently supported by

the record. In particular, Dash.fi does not show that Meta has the requisite dominant share of the digital advertising market. Dash.fi's Reply cites only evidence that "Dash.fi Card customers use the card to pay for advertising and receive access to Ad Pay Protection . . . to scrutinize advertising charges billed by platforms such as Meta," that Dash.fi found that up to 3.5% of charges incurred for Meta services were derived from invalid traffic, and that Dash.fi sent refund requests to Meta which were "immediately rejected or ignored." (Dkt. No. 14-3 ¶¶ 7, 14, 17; *see also* Dkt. No. 27 at 15.) None of that shows that "Meta dominates the digital advertising market." (Dkt. No. 27 at 15.)

Moreover, there is also insufficient evidence showing that Meta's Dash.fi card refusals harmed competition as opposed to merely harming Dash.fi's business. While Meta told some customers that they would be required to pay via monthly invoicing (*see* Dkt. No. 14-15), some customers were able to "continue using other cards" instead of the Dash.fi card (Dkt. No. 14-3 ¶ 27) or were told to use "a payment method that supports Meta's verification requirements, such as a credit card issued by a traditional bank" (Dkt. No. 14-17). And unlike the facts in *LinkedIn*, there is no evidence that Meta excluded Dash.fi from accessing or analyzing public information. *Cf.* 31 F.4th at 1194 ("[E]xclusion of the original innovator in aggregating and analyzing the public information—may well be considered unfair competition under California law."). Meta restricted Dash.fi's access to certain data Meta shared with its customers, but nothing suggests that this was outside of Meta's rights to control its private data sharing as it saw fit. (Dkt. No. 14-3 ¶ 45.)

Dash.fi's "very general allegation" about Meta's card refusals harming competition "does not satisfy *Cel–Tech's* requirement that the effect of [Meta's] conduct amounts to a violation of antitrust laws or 'otherwise significantly threatens or harms competition.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1137 (9th Cir. 2014) (quoting *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 187 (1999)). Meta's card refusals do not raise a serious question as to the merits, and thus cannot support a preliminary injunction.

***Tentative conclusion.*** Since Dash.fi has not shown irreparable harm that is causally

linked to a claim for which it has shown serious questions on the merits or a likelihood of success, the Court need not reach the balance of equities and public interest factors. Dash.fi's Motion for Temporary Restraining Order, and its request for a preliminary injunction, should therefore be denied. Because the evidence Dash.fi submitted alongside its Reply does not alter the Court's analysis, Meta's Motion to Strike should be denied as moot.

At the hearing, each side may address the tentative opinion and any additional argument that they wish the Court to hear. The parties shall not file written responses to this notice.

**IT IS SO ORDERED.**

Dated: October 14, 2026

RITA F. LIN
United States District Judge